**14-2410-cv**
*Munn v. Hotchkiss Sch.*

In the
United States Court of Appeals
For the Second Circuit

————

AUGUST TERM, 2014

ARGUED: MAY 4, 2015
DECIDED: AUGUST 3, 2015

No. 14-2410-cv

ORSON D. MUNN, III, AS PARENT & NEXT FRIEND OF C.M. & IND., CHRISTINE
MUNN, AS PARENT & NEXT FRIEND OF C.M. & IND., CARA L. MUNN,
*Plaintiffs-Appellees,*

*v.*

THE HOTCHKISS SCHOOL,
*Defendant-Appellant.*

————

Appeal from the United States District Court
for the District of Connecticut.
No. 09-cv-919 – Stefan R. Underhill, *Judge.*

————

Before: WALKER, LYNCH, and LOHIER, *Circuit Judges.*

————

Cara Munn and her parents brought suit against the Hotchkiss
School after Munn contracted tick-borne encephalitis on a school-
organized trip to China. At trial, a jury found Hotchkiss negligent and

awarded the Munns $41.5 million in damages, $31.5 of which were non-economic damages. On appeal, the school argues that it did not have a legal duty to warn about or protect against tick-borne encephalitis and that the jury award is excessive. Although we agree with the plaintiffs that there was sufficient evidence for a jury to find Munn's illness foreseeable, we are unable to determine whether public policy supports imposing a legal duty on Hotchkiss. This case implicates important and unresolved issues of Connecticut state law and public policy. It is likely to have repercussions on future negligence cases in Connecticut, and existing case law provides insufficient guidance on some of the issues raised. Accordingly, we certify two questions to the Connecticut Supreme Court: (1) Does Connecticut public policy support imposing a duty on a school to warn about or protect against the risk of a serious insect-borne disease when it organizes a trip abroad? (2) If so, does an award of approximately $41.5 million in favor of the plaintiffs, $31.5 million of which are non-economic damages, warrant remittitur?

_____

WESLEY W. HORTON, Horton, Shields & Knox, P.C., Hartford, CT (Karen L. Dowd, Kenneth J. Bartschi, Horton, Shields & Knox, P.C., Hartford, CT, Aaron S. Bayer, Jeffrey R. Babbin, Wiggin and Dana LLP, New Haven, CT, *on the brief*), *for Defendant-Appellant*.

ANTONIO PONVERT III, Koskoff Koskoff & Bieder, Bridgeport, CT (Alinor C. Sterling, Koskoff Koskoff &

Bieder, Bridgeport, CT, *on the brief*), *for Plaintiffs-Appellees.*

_____

JOHN M. WALKER, JR., *Circuit Judge*:

Cara Munn and her parents brought suit against the Hotchkiss School after Munn contracted tick-borne encephalitis on a school-organized trip to China. At trial, a jury found Hotchkiss negligent and awarded the Munns $41.5 million in damages, $31.5 of which were non-economic damages. On appeal, the school argues that it did not have a legal duty to warn about or protect against tick-borne encephalitis and that the jury award is excessive. Although we agree with the plaintiffs that there was sufficient evidence for a jury to find Munn's illness foreseeable, we are unable to determine whether public policy supports imposing a legal duty on Hotchkiss. This case implicates important and unresolved issues of Connecticut state law and public policy. It is likely to have repercussions on future negligence cases in Connecticut, and existing case law provides insufficient guidance on some of the issues raised. Accordingly, we certify two questions to the Connecticut Supreme Court: (1) Does Connecticut public policy support imposing a duty on a school to warn about or protect against the risk of a serious insect-borne disease when it organizes a trip abroad? (2) If so, does an award of approximately $41.5 million in favor of the plaintiffs, $31.5 million of which are non-economic damages, warrant remittitur?

**BACKGROUND**

We recite the facts in the light most favorable to the plaintiffs in light of the jury verdict in their favor. *See Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 195 (2d Cir. 2004).

**A. The Trip to China**

During her freshman year, Cara Munn ("Munn"), then a fifteen-year-old student at the Hotchkiss School ("Hotchkiss"), a private boarding school, decided to participate in a summer program in Tianjin, China, organized by Hotchkiss. The month-long program immersed students in Chinese language classes and included weekend trips to cultural landmarks.

Jean Yu, the school's Chinese Language and Culture Program Director, served as the trip leader. In preparation for the trip, in March 2007, she sent parents a packet outlining activities and a set of legal forms for the participants and parents to waive legal claims against the school. The packet mentioned a visit to Mount Panshan, referred to by the parties as "Mt. Pan." The school also sent medical advice for the trip, including a link to a Centers for Disease Control and Prevention ("CDC") webpage and a note that the school's infirmary could "serve as a travel clinic." Special App'x 16**.** The webpage linked to the CDC's Central America site instead of its China site, however, and the infirmary was unable to provide independent medical advice. Finally, the school sent an itinerary, packing list, and a handbook on international travel. The packing list mentioned

bug spray in its "miscellaneous" category, but included no warning about insect-borne diseases in the section where other health risks were mentioned.

On June 23, 2007, while on the trip, the students went for a weekend excursion to the Great Wall and to Mt. Pan. Mt. Pan is a forested mountain. Again, no warnings to wear bug spray were given. Trip leader Yu left her bug spray on the bus. After hiking to the top of the mountain, a group of three or four students, including Munn, decided to hike down, while the others took a cable car. Yu pointed them to the path and said that she would wait for them at the bottom. Munn testified that the students decided to leave the paved path and follow narrow dirt trails instead. The students got lost and walked among trees and through brush.

Munn testified at trial that after the trip to Mt. Pan she had many insect bites and an itchy welt on her left arm. Ten days later, she awoke with a headache, a fever, and wooziness. Her condition deteriorated rapidly and she was taken to a local hospital. Munn was then transferred to a Beijing hospital and her parents came from the United States. Severely ill and partially paralyzed, Munn was soon airlifted back to New York. Munn was diagnosed with tick-borne encephalitis ("TBE"), a viral infectious disease which affects the central nervous system.

Because of her illness, Munn lost the ability to speak. At trial, she testified through a machine into which she typed her answers. She has difficulty controlling her facial muscles, causing her to drool. Her mother

testified about Munn's frustration with her inability to speak and stated that Munn experiences "a lot of rejection." Joint App'x 1191-92. Munn has also lost some cognitive function, particularly in terms of reading comprehension and math. Still, Munn has managed to live a functional life. She finished high school and attended Trinity College. She can play sports, still travels, and has held summer internships.

## B. Procedural History

On June 11, 2009, Munn and her parents filed this diversity action against Hotchkiss alleging that the school's negligent planning and careless supervision of the trip caused her illness.

In their lawsuit, the Munns alleged that Hotchkiss was negligent in 1) failing to warn the Munns about the risks of viral encephalitis; 2) failing to provide for proper protective clothing, insect repellent, or vaccinations; 3) failing to provide medical personnel on the trip; 4) failing to establish procedures for addressing medical emergencies; and 5) failing to advise the Munns on the availability of vaccines against viral encephalitis for children traveling to rural areas of China. At trial, the Munns proceeded only on the first and second theories of liability—failure to warn and failure to protect.

Hotchkiss asserted a number of affirmative defenses, including that the Munns assumed the risk by signing the school's "Agreement, Waiver, and Release of Liability." However, the district court (Stefan R. Underhill,

6

*J.*) excluded the waiver, finding both that its language was ambiguous and that it was against public policy under Connecticut law.

At trial, the plaintiffs offered two experts, Stuart Rose, an expert on travel medicine, and Peter Tarlow, an expert on tourism-risk management who testified about standards of care. Hotchkiss also offered two experts, David Freedman, a travel-medicine expert, and William Fluharty, proffered as an expert on standards of care followed by similarly-situated schools. The district court, however, excluded Fluharty's testimony after it was given, finding that he had fabricated and misrepresented support for his testimony.

At the conclusion of the plaintiffs' case, Hotchkiss sought a directed verdict under Rule 50(a) of the Federal Rules of Civil Procedure, arguing that Munn contributed to her own injuries and that the risk of contracting TBE was unforeseeable. The district court denied that motion.

On March 27, 2013, after a seven-day trial, the jury found Hotchkiss solely liable. Specifically, the jury found that Hotchkiss was negligent in failing to warn Munn of the risk of serious insect-borne illnesses and in failing to ensure that she took protective measures. The jury also found no contributory negligence on the part of Munn. It awarded $10.25 million in past and future economic damages, and $31.5 million in non-economic damages. Hotchkiss renewed its Rule 50 motion and filed a motion for a new trial under Rule 59.

On June 5, 2014, the district court denied both of these motions. Pursuant to the parties' stipulation, it reduced the monetary award by the amount that the Munns had collected from collateral sources. The total award against Hotchkiss is now approximately $41.5 million.

**<u>DISCUSSION</u>**

Hotchkiss argues on appeal that it did not have a legal duty to warn about or protect against tick-borne encephalitis and that the $41.5 million jury award is excessive. The school asserts that the jury verdict is not supported by sufficient evidence and that it contravenes Connecticut public policy to impose a duty to warn about or protect against a disease as remote as tick-borne encephalitis.[1]

Because this case implicates complex and unresolved issues of state law and public policy, we certify two questions of law to the Connecticut Supreme Court: (1) Does Connecticut public policy support the imposition of a duty on a school to warn about or protect against the risk of a serious insect-borne disease when it organizes a trip abroad? (2) If so, does an award of approximately $41.5 million in favor of the plaintiffs, $31.5 million of which are non-economic damages, warrant remittitur?

---

[1] Hotchkiss raises several other arguments in its appeal that we do not reach here because the questions we certify could be outcome determinative. The school asserts that the jury charge was misleading, that the district court abused its discretion in excluding Fluharty's testimony while at the same time admitting the testimony of the plaintiffs' experts, that there was insufficient evidence that Munn was bitten on Mt. Pan, and that the district court erred in excluding the release of claims.

## I.    Foreseeability

Hotchkiss first argues that there was insufficient evidence to support the jury verdict that it was foreseeable Munn would contract a serious insect-borne illness on the trip to China. We disagree. Upon review of the record, we find that the plaintiffs presented sufficient evidence at trial that Hotchkiss should have known of the risk of serious insect-borne diseases.

We will overturn a jury verdict only if there is such a "complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the appellant that reasonable and fair minded men could not arrive at a verdict against the appellant." *Gronowski v. Spencer*, 424 F.3d 285, 292 (2d Cir. 2005) (internal quotation marks and alterations omitted). In addition, "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; we defer to the jury's assessments of both of these issues." *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996).

Under Connecticut negligence law, a legal duty requires that (1) "an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result," and (2) a determination by the court "on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case." *Sic v. Nunan*, 307 Conn.

9

399, 407-08 (2012) (internal quotation marks omitted). Recently, the Connecticut Supreme Court reiterated that "as long as harm of the general nature as that which occurred is foreseeable there is a basis for liability even though the manner in which the accident happens is unusual, bizarre or unforeseeable." *Ruiz v. Victory Props., LLC*, 315 Conn. 320, 335 (2015) (internal quotation marks and alteration omitted).

Connecticut decisions construe foreseeability broadly. For example, in *Ruiz*, where a ten-year-old child dropped a piece of concrete from the third floor resulting in the injury of a seven-year-old child below, the Connecticut Supreme Court held that it could be foreseeable that backyard debris in an apartment building would lead to injury when children used the area as a playground. In reaching this conclusion, the court emphasized that its "cases have attempted to safeguard children of tender years from their propensity to disregard dangerous conditions." *Id.* at 333 (internal quotation marks omitted). Although Cara Munn was several years older than the children in *Ruiz*, the decision can be read to indicate that Connecticut courts construe foreseeability broadly, especially as it relates to children.

Here, the evidence presented at trial was sufficient to support the jury's verdict that Munn's illness was foreseeable. Hotchkiss introduced a CDC China advisory last modified on August 1, 2007 that included a warning that "[t]ickborne encephalitis occurs in forested regions in northeastern China and in South Korea." Joint App'x 1892. The evidence

also showed that Mt. Pan is a forested mountain in the northeastern Chinese province of Tianjin. In addition, Hotchkiss's expert, David Freedman, testified that the August 1, 2007 advisory would put a school on notice that there was a risk of TBE in northeastern China. Although the August 1, 2007 advisory was dated more than one month after Munn's visit to Mt. Pan, the school's Director of International Programs, David Thompson, testified that he had seen a warning about TBE on the CDC's China page before the trip. On direct examination, he answered yes when asked if he "recall[ed] seeing information . . . about a risk of tick-borne encephalitis in Northeast China at the time of this trip," Joint App'x 1037, and acknowledged that he "looked at" the August 1, 2007 advisory in preparation for the trip, Joint App'x 1040. In addition, other travel advisories, including a CDC advisory dated in April 2007—before the trip—mentioned serious insect-borne diseases, including Japanese encephalitis, and notices on travel websites and other government websites warned of tick-borne encephalitis in East Asia, and specifically in China.

Hotchkiss argues on appeal that the jury could not have found the disease foreseeable based on the August 1, 2007 travel advisory because the advisory was released after the trip. Hotchkiss, which introduced the advisory as a defense trial exhibit and from which its own witness testified as to trip preparation awareness, now attempts to discredit its own exhibit. The school instead asks us to consider an earlier advisory dated May 23,

2007, which does not mention TBE. That advisory, however, was not introduced at trial and is not part of the record. We will not consider new evidence "absent extraordinary circumstances" and no such circumstances are present here. *Int'l Bus. Machines Corp. v. Edelstein*, 526 F.2d 37, 45 (2d Cir. 1975) (per curiam). Furthermore, while the August 1, 2007 advisory postdates the trip, it is possible that a similar advisory was on the website before, which would explain Thompson's testimony about seeing the advisory. Neither party presented evidence about what was posted on the CDC website when the trip actually occurred, and we will not disturb the jury's assessment of the evidence and its finding of reasonable foreseeability.

## II. Public Policy

### A. Duty

Hotchkiss also argues on appeal that imposing a legal duty to warn or protect in this case contravenes Connecticut public policy. This argument presents a closer question. However, Connecticut precedent does not offer sufficient guidance on whether public policy supports imposing a duty on Hotchkiss, and the parties present compelling arguments on both sides. In these circumstances, rather than attempting to discern Connecticut public policy ourselves, we think it preferable to certify the question to the Connecticut Supreme Court.

As an initial matter, we disagree with the plaintiffs that Hotchkiss has waived this argument by not raising it in its Rule 50 motion. Hotchkiss

has not waived its public policy argument because it raised the argument in its motion for summary judgment and it is a question of law solely for the court. We have previously stated that "where the trial court's denial of a summary judgment motion is not based on the sufficiency of the evidence, but on a question of law, the rationale behind Rule 50 does not apply, and the need for such an objection [through a Rule 50 motion] is absent." *Rothstein v. Carriere*, 373 F.3d 275, 284 (2d Cir. 2004). Thus we find that this argument was not waived.

### 1. The Applicable Law

Under Connecticut law, foreseeability of harm alone is not determinative of duties in tort and the imposition of a duty of care also implicates questions of public policy. The Connecticut Supreme Court has stated:

> A simple conclusion that the harm to the plaintiff was foreseeable cannot by itself mandate a determination that a legal duty exists. Many harms are quite literally foreseeable, yet for pragmatic reasons, no recovery is allowed. A further inquiry must be made, for we recognize that duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection. . . . The final step in the duty inquiry, then, is to make a determination of the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results.

*Murillo v. Seymour Ambulance Ass'n, Inc.*, 264 Conn. 474, 479-80 (2003) (internal quotation marks and alterations omitted).

No Connecticut case closely resembles this one, but in at least two cases, the Connecticut Supreme Court has overturned jury verdicts by finding that public policy did not support the imposition of a duty on the tortfeasor. In *Jaworski v. Kiernan*, 241 Conn. 399, 409 (1997), the Connecticut Supreme Court overturned a jury verdict finding a recreational soccer player responsible for another player's injury based on a theory of negligence. The court reasoned that public policy favors encouraging competitive sports. In reaching this conclusion, it noted that other jurisdictions have required deliberate or reckless conduct, not just negligence. *Id.* And in *Lodge v. Arett Sales Corp.*, 246 Conn. 563, 577 (1998), the Connecticut Supreme Court overturned a jury verdict against an alarm company for injuries incurred by firefighters in a brake failure when they were responding to a false alarm. The court noted, "[w]e focus our decision, therefore, equally on the policy implications of this case rather than strictly upon the foreseeability of the plaintiffs' harm." *Id.* at 576-77; *see also RK Constructors, Inc. v. Fusco Corp.*, 231 Conn. 381, 387-88 (1994) (finding no duty as a policy matter because the relationship between increased insurance premiums and defendant's conduct was too attenuated).

More recently, in *Mercier v. Greenwich Acad., Inc.*, No. 13-CV-4 (JCH), 2013 WL 3874511, at *5 (D. Conn. July 25, 2013), a federal judge applying Connecticut law declined to impose a duty on a coach and school after a player was injured during a basketball game. The court reasoned that

Connecticut public policy weighs in favor of encouraging "vigorous participation in recreational sporting activities," even if those activities create safety risks. *Id.* at *4 (quoting *Jaworski*, 241 Conn. at 408). Holding the coach responsible, the court concluded, would chill the coach's role of encouraging competition in sports. *Id.* at *5.

Cases like *Jaworski* and *Mercier* indicate that courts place a high value on recreational activities for children, even if they sometimes create safety concerns. Although the present case does not involve competitive sports, it also implicates important questions of public policy because of the benefits of educational trips for children.

Connecticut courts addressing public policy questions have considered four factors to determine whether to impose a duty in negligence cases: "(1) the normal expectations of the participants in the activity under review; (2) the public policy of encouraging participation in the activity, while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions." *Monk v. Temple George Assocs., LLC*, 273 Conn. 108, 118 (2005) (internal quotation marks omitted). The four public policy factors do not point to an obvious answer in this case as both parties present colorable arguments on either side.

First, the expectations of the parties depend on the level of generality applied to describe the events that occurred in this case. Parents and children participating in a school-sponsored international trip might

15

expect a school to warn about or protect against some of the risks of the trip, including potentially the dangers of serious insect-borne diseases. However, as Hotchkiss and several *amici* point out, it is unreasonable to expect a trip organizer to warn students about or protect them against every danger. Field trips are *intended* to expose children to situations outside of their comfort zones and of the organizers' control. Such trips thus naturally entail a certain level of risk. Here, the risk of contracting tick-borne encephalitis was undeniably remote. No American had ever before contracted TBE in China. Thus, although travelers may generally expect a school to warn about or protect against dangers, including serious insect-borne diseases, no one could have expected that Munn would contract TBE.

Second, international trips and outdoor activities, while sometimes posing substantial health and safety risks, offer important benefits to their participants. The public benefits of international education and student exchanges are written into Connecticut statutory law. Connecticut General Statute Section 10-27(a) states:

> It shall be the policy of the state to encourage its students, teachers, administrators and educational policy makers to participate in international studies, international exchange programs and other activities that advance cultural awareness and promote mutual understanding and respect for the citizens of other countries.

At the same time, the safety of minors, who in varying degrees are under the care and protection of schools on these trips, is an important concern.

Minors on such trips are in the custody of the organizations leading them, and the health and safety of the children must have a bearing on how these trips are conducted.[2]

Third, this case is likely to have repercussions on litigation in the area of child safety, especially in light of the substantial damages awarded to these plaintiffs. If the award stands, it would set an important precedent for negligence cases arising from educational trips.  In fact, the effects of this case are already manifest. Munn's attorney recently brought another lawsuit in which the plaintiff seeks the same damage award for contracting Lyme disease at a YMCA camp. *Horowitz v. YMCA Camp Mohawk, Inc.*, 13-cv-1458 (D. Conn. 2013). This case is likely to encourage future victims of unusual accidents on educational trips to seek compensation, placing a heavy financial burden on trip providers. On the other hand, it is reasonable to suppose that such liability could also cause an increase in diligence on the part of trip providers, potentially avoiding catastrophic injuries such as befell Munn. *See Monk*, 273 Conn. at 120.

Fourth, no case is exactly analogous to this one, but courts in several other jurisdictions have declined to impose a duty in similar cases and have construed the duties of schools more narrowly. In *David v. City of New York*, 40 A.D.3d 572, 574 (N.Y. App. Div. 2007), the court found that a

---

[2] Notably, while encouraging international exchange programs, the Connecticut legislature has not, as at least one other state has, enacted a statutory immunity for school trips. *See* Cal. Educ. Code § 35330(d).

school did not breach a duty of supervision where a child was injured on a hay ride. The court noted that previous hay rides had occurred without incident and that the school had "no knowledge or notice that [the] hay ride would be hazardous." *Id.* In *Mancha v. Field Museum of Natural History*, 5 Ill. App. 3d 699, 702 (1972), the court declined to impose a duty where a child on a field trip was assaulted by unaffiliated students. The court found that "the risk that a 12-year-old boy would be assaulted in a museum is minimal" and that recognizing a duty would impose a significant burden of supervision on the school. *Id.* It stated:

> A teacher cannot be required to watch the students at all times while in school, on the grounds, or engaged in school-related activity. If the law imposed such burdens it would well discourage schools and teachers from affording opportunities to children to enjoy the many extracurricular activities. It has long been recognized that something other than classroom teaching is needed for a sound education. Learning is not confined to books.

*Id.* These two cases indicate efforts by other jurisdictions to encourage extracurricular activities by limiting the duties of schools to warn about or protect against unlikely or unusual events. At the same time, there are also instances where courts have found that schools owe a duty in the context of extracurricular activities. *See, e.g.*, *City of Cedar Falls v. Cedar Falls Cmty. Sch. Dist.*, 617 N.W.2d 11, 16-18 (Iowa 2000) (school district liable for negligence resulting in kindergarten student's death in golf cart accident during field trip); *Travis v. Bohannon*, 128 Wash. App. 231, 239 (2005)

(school district owed duty of care to high school students participating in off-campus "Workday").

Upon review of these four factors and of Connecticut precedent in negligence cases, we are unable to determine whether Connecticut public policy supports imposing a duty to warn or protect in this case. Although prior Connecticut decisions in the area of recreational sports suggest that public policy may favor placing limits on schools' legal duties in the context of school trips because of their educational benefits, no case has yet addressed this precise question and no case is close to the facts of this case.

### 2. Certification

Because Connecticut case law does not offer sufficient guidance on the question of public policy in negligence cases, we think it best to let the Supreme Court of Connecticut determine whether Connecticut public policy supports imposing a legal duty on Hotchkiss.

Our court rules and Connecticut law enable us to certify a question to the Supreme Court of Connecticut "if the answer may be determinative of an issue" in a case before us and "if there is no controlling appellate decision, constitutional provision or statute." Conn. Gen. Stat. § 51–199b(d); *see* 2d Cir. Local R. 27.2; *see also Caruso v. Siemens Bus. Commc'ns Sys., Inc.*, 392 F.3d 66, 71 (2d Cir. 2004) (certifying question where "no Connecticut court has ever provided an authoritative answer"). "Certification is especially important in categories of cases where, unless there is certification, the state courts are substantially deprived of the

opportunity to define state law." *Gutierrez v. Smith*, 702 F.3d 103, 116 (2d Cir. 2012). We have "long recognized that state courts should be accorded the first opportunity to decide significant issues of state law through the certification process," and that, especially where the issues "implicate[] the weighing of policy concerns, principles of comity and federalism strongly support certification." *Parrot v. Guardian Life Ins. Co. of Am.*, 338 F.3d 140, 144 (2d Cir. 2003), *certified question answered*, 273 Conn. 12 (2005).

Certification is appropriate in this case for at least three reasons. First, as discussed above, Connecticut case law provides limited guidance on this issue and no prior case is authoritative here. Whether Hotchkiss owed a duty of care is determinative in this case. Second, the scope of duty in negligence law is "paradigmatically a state field," typically addressed by state, rather than federal, courts. *Id.* at 145 (internal quotation marks omitted); *see also Izzarelli v. R.J. Reynolds Tobacco Co.*, 731 F.3d 164, 169 (2d Cir. 2013) (certifying to Connecticut Supreme Court where "question is one of state law and is vigorously argued on both sides"). Third and most importantly, this case is likely to have repercussions beyond this particular fact pattern as it implicates broad questions of Connecticut public policy.

Defining the scope of a school's duty when it leads an international trip could have significant consequences for negligence litigation in Connecticut, which is home to many private and public schools. Although cost-benefit analysis in most cases assumes that all interested parties are represented in the case, this is not so here. The societal impact of finding a

duty here extends far beyond Hotchkiss. To impose a duty on Connecticut schools to warn about or protect against risks as remote as tick-borne encephalitis might discourage field trips that serve important educational roles. *See generally* Philip K. Howard, *The Collapse of the Common Good* (2001). If the costs imposed on schools and non-profit organizations become too high, such trips might be curtailed or cease completely, depriving children of valuable opportunities.[3] Public policy may thus require that participants bear the risks of unlikely injuries and illnesses such as the one that occurred in this case so that institutions can continue to offer these activities.

On the other hand, imposing a duty of reasonable care on Hotchkiss may not have the effect of increasing litigation. If schools take steps to protect students from foreseeable harms, legal actions may in fact decrease. Alternatively, those actions premised on an absolute demand to ensure student safety "as opposed to the failure . . . to take reasonable precautions, likely will be dismissed in the absence of negligence." *Monk*, 273 Conn. at 120. Balancing these factors is a task primarily for state decisionmakers rather than federal courts.

---

[3] For more discussion of the risk that excessive tort liability might deter socially beneficial activities, see Steven Shavell, *Foundations of Economic Analysis of Law* 177-206 (2004).

We conclude that certification would allow Connecticut to carefully consider and weigh the policy concerns at play in this case and to shape its own state negligence law as to the responsibilities of schools on field trips.

**B. Remittitur**

This case is also unusual because of the large award granted to the plaintiffs. The public policy implications of the $41.5 million awarded in damages also lead us to certify the issue of remittitur to the Supreme Court of Connecticut.

Because Connecticut law governs the claims for relief in this diversity case, it also governs the excessiveness of the verdict and the question of remittitur. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 429-31 (1996). To determine whether to grant remittitur, a trial court must evaluate "whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption." *Birgel v. Heintz*, 163 Conn. 23, 28 (1972). On appeal, "we are limited to determining whether the trial court abused its discretion in denying the motion to set aside the verdict." *Champagne v. Raybestos-Manhattan, Inc.*, 212 Conn. 509, 557 (1989).

In *Champagne*, the Connecticut Supreme Court ordered remittitur on a $320,000 loss of consortium award for a wife whose husband became sick from his exposure to asbestos at work. Despite the limited scope of

appellate review in this area, the court concluded that the award was excessive. It found that the "evidence of the loss of consortium is sparse, especially when viewed in the time frame that it is suggested to encompass." *Id.* Similarly, in *Buckman v. People Express, Inc.*, the court concluded that a $50,000 award was excessive for a plaintiff who suffered emotional distress because he was temporarily "under the impression that he had no medical coverage." 205 Conn. 166, 167 (1987). Again, the court found that the evidence did not support the award, and it noted that "the jury . . . could not reasonably have found that the plaintiff is entitled to recover $50,000." *Id.* at 176. These two cases indicate that Connecticut appellate courts can overturn jury awards or order remittitur where the evidence does not support the size or scope of the jury's damages award.

In several other cases, however, Connecticut courts have upheld large jury awards for disastrous injuries. *See, e.g.*, *Mather v. Griffin Hosp.*, 207 Conn. 125 (1988) ($9 million—roughly $18 million adjusted for inflation—for medical malpractice in infant's delivery that resulted in cerebral palsy); *Pelletier v. Sordoni/Skanska Constr. Co.*, No. X06CV950155184S, 2006 WL 760140, at *3 (Conn. Super. Ct. Mar. 9, 2006) ($22.7 million award for injury that severed plaintiff's spinal cord), *rev'd on other grounds*, 286 Conn. 563 (2008); *see also Pouliot v. Paul Arpin Van Lines, Inc.*, 235 F.R.D. 537 (D. Conn. 2006) ($20 million non-economic damages for permanent impairment of 92% of plaintiff's body, causing plaintiff mental anguish and depression).

Here, the record makes it difficult to determine how the damages relate to the evidence at trial. Munn has suffered serious permanent injuries that alter her everyday life. The parties do not debate that the disease has limited Munn's ability to express herself and to control her facial expressions. However, the attorneys gave no guidance on non-economic damages in their summations. While the plaintiffs' attorney offered a detailed calculation of economic damages, he spoke only in generalities about non-economic damages, emphasizing Munn's injuries and her loss of enjoyment. Hotchkiss's attorney did not discuss non-economic damages at all when she spoke to the jury. The evidence at trial and the attorney summations thus offer little basis on which to explain how the jury chose to award $31.5 million in non-economic damages. Although non-economic damages are always abstract—pain and suffering are difficult to quantify—this problem is particularly salient in this case because of the size of the non-economic damages, which are more than three times the economic damages, and the lack of discussion in the record about non-economic damages.

Moreover, the large damages awarded in this case are intertwined with the broader public policy issues relating to educational trips discussed in the previous section. The enormous award magnifies the effects of the lawsuit on organizations offering educational trips. The $41.5 million in damages might have a chilling effect on educational trips. Indeed, such awards could have existential consequences for schools or

organizations hosting these trips. Although insurance may cover a portion of damages in such lawsuits, awards of this magnitude might lead to significantly increased premiums. The damages might discourage schools and other organizations from offering such trips for fear that they will suffer a crippling lawsuit.

Because the damages are inextricably linked to the broader public policy issues in this case, we deem it prudent to certify the issue of remittitur to the Connecticut Supreme Court. The Connecticut Supreme Court has never considered the excessiveness of an award of this magnitude, nor has it provided specific criteria for evaluating these awards. And damages in negligence cases are also "paradigmatically a state field." Finally, the size of this award makes it likely that it will have repercussions far beyond this case and affect the whole industry of educational trips. For these reasons, we leave it to the Supreme Court of Connecticut to determine whether and how remittitur might help shape state public policy on educational trips.

## CONCLUSION

We address only the duty question and remittitur, and we do not reach the other issues raised in this appeal because the Connecticut Supreme Court's answers on the public policy questions could be determinative.

For the reasons stated above, we certify two questions of law to the Connecticut Supreme Court: (1) Does Connecticut public policy support

25

imposing a duty on a school to warn about or protect against the risk of a serious insect-borne disease when it organizes a trip abroad? (2) If so, does an award of approximately $41.5 million in favor of the plaintiffs, $31.5 million of which are non-economic damages, warrant remittitur?

The Connecticut Supreme Court may modify these two questions as it sees fit and, should it choose, may direct the parties to address other questions it deems relevant. This panel retains jurisdiction over this case and will decide any remaining issues once the Connecticut Supreme Court has ruled.

It is therefore **ORDERED** that the Clerk of this court transmit to the Clerk of the Connecticut Supreme Court a Certificate, as set forth below, together with this decision and a complete set of the briefs, appendices, and record filed in this court by the parties.