Evanston Insurance Co. v. William Kramer & Associates, LLC.

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2017

(Argued: August 18, 2017          Decided: May 10, 2018)

Docket No. 16-2082

———————————————————

Evanston Insurance Company,

*Plaintiff-Appellant,*

v.

William Kramer & Associates, LLC,

*Defendant-Appellee.*

———————————————————

Before:

PIERRE N. LEVAL, REENA RAGGI, and RAYMOND J. LOHIER, JR.,
*Circuit Judges.*

Plaintiff appeals from the judgment of the United States District Court for the District of Connecticut (Michael P. Shea, *J.*) granting judgment as a matter of law in favor of Defendant. Plaintiff, successor-in-interest to an insurer of property damaged by a hurricane, brought this negligence action against Defendant, the insurer's loss adjustment agent, for failure to inform it of a mortgage on the property. Plaintiff filed suit after the three-year limitations period imposed by § 52-577 of the Connecticut General Statutes. At trial, a jury found that a continuing course of conduct tolled the statute of limitations, and issued a verdict in Plaintiff's favor. The district court overturned the jury's verdict as to tolling and found Plaintiff's claim time-barred. We conclude that Connecticut case law is unclear about the scope of the continuing course of conduct doctrine, and thus the reasonableness of the jury's verdict. We CERTIFY the question to the Connecticut Supreme Court.

MARY MASSARON, Plunkett Cooney, Bloomfield Hills, MI, *for Plaintiff-Appellant*.

RICHARD A. SIMPSON (Kimberly A. Ashmore, *on the brief*), Wiley Rein LLP, Washington, DC, *for Defendant-Appellee*.

LEVAL, *Circuit Judge*:

Plaintiff Evanston Insurance Co. (hereinafter the "Plaintiff" or the "Insurer") appeals from the entry of judgment as a matter of law by the United States District Court for the District of Connecticut (Michael P. Shea, *J.*) in favor of defendant William Kramer & Associates, LLC (hereinafter the "Defendant" or the "Adjuster"), which served as the Insurer's adjuster on a claim for hurricane damage. The Adjuster negligently failed to advise the Insurer of a mortgage on the insured property, with the consequence that the Insurer incurred liability in favor of the mortgagee for paying the claim without protecting the mortgagee's interest in the damaged property. The Insurer brought this action against its Adjuster, alleging negligence, but filed the suit more than the three years after the event that the Connecticut statute of limitations allows. CONN. GEN. STAT. § 52-577. Upon trial, the jury rendered a verdict in favor of the Insurer, concluding that the limitations period was

tolled by a continuing course of conduct between the Insurer and the Adjuster. The District Court, however, set aside the jury's verdict, ruling that the Insurer's evidence of a continuing course of conduct was insufficient to justify tolling, so that the suit was untimely as a matter of law. Under Connecticut General Statutes § 51-199b(d), with the consent of the parties, we interrupt the course of appeal, invoking the certification process to ask the guidance of the Supreme Court of Connecticut as to whether the Connecticut doctrine of a continuing course of conduct between the parties permitted tolling of the statutory limitations period on these facts.[1]

**BACKGROUND**

The evidence, if considered in the light most favorable to the Plaintiff, showed the following.

On October 24, 2005, Hurricane Wilma damaged a commercial property in Florida known as "the Villas." The Villas was insured under a

---

[1] The Supreme Court of Connecticut "may answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute . . . ." CONN. GEN. STAT. § 51-199b(d). *See also*, *Munn v. Hotchkiss Sch.*, 795 F.3d 324, 334-35 (2d Cir. 2015).

policy written by the Insurer's predecessor, Essex Insurance Co.[2] The Defendant, an independent loss adjuster, had been retained by another insurer of the Villas property to perform adjustment with respect to the storm damage claim, and had already done work on the project. The Adjuster solicited the Insurer to be retained as its adjuster as well. It is commonplace for different insurers of the same property to hire the same independent adjuster for the claim so that they can share the benefits of the adjuster's work on the matter. Plaintiff accordingly hired the Adjuster to perform a "full adjustment service" under the policy Plaintiff had written. App'x at 799. The Adjuster's duties included inspecting the insured property, determining the amount of damage, reviewing the insurance policy for potential coverage issues, negotiating the loss claim with the insured and its representatives, seeking resolution of and compromises for matters in dispute, reporting on the investigation and the claim measure process, and making recommendations as to how the insurer should proceed with the adjustment.

---

[2] As there is no meaningful difference for purposes of this appeal between the plaintiff, Evanston Insurance Co., and its predecessor, Essex Insurance Co., we will refer to both indiscriminately as the Insurer or the Plaintiff.

Of particular pertinence here, the Adjuster's duties also included informing the Insurer of any mortgages on the damaged property. Proper performance of this duty was of great importance to the Insurer because payments it would make with respect to the loss would need to take account of the interest of mortgagees in the insured property. The district court instructed the jury, and it is undisputed in the parties' briefs on appeal, that when the Insurer hired the Adjuster, the Adjuster became the Insurer's "agent and therefore had a special relationship of trust with [the Insurer]." *Essex Ins. Co. v. William Kramer & Assocs., Inc.*, No. 3:13-cv-1537, 2016 WL 3198190, at *10 (D. Conn. June 8, 2016) (internal quotation marks omitted); *see also id*. at *10 n.8 (citing *Taylor v. Hamden Hall Sch., Inc.*, 149 Conn. 545, 552 (1962), for the proposition that "[a]n agent is a fiduciary with respect to matters within the scope of his agency").

On April 25, 2006, the Adjuster received a letter identifying a mortgage on the property in favor of Intervest National Bank ("Intervest"), as mortgagee. The Adjuster promptly responded, acknowledging receipt, and placed the letter in its file. Nonetheless, on June 22, 2006 and July 19, 2006, the Adjuster erroneously asserted in written reports to the Insurer that there were

no mortgages, stating: "Villas at Lauderhill[:] No Mortgagee." App'x at 143, 153. The Adjuster also emailed the Insurer on August 28, 2006 that "[t]here is not a mortgage company for 'The Villas.'" *Id*. at 166. Continuing through March 2007, the Insurer repeatedly asked the Adjuster about mortgages. The Adjuster repeatedly and erroneously informed the Insurer that there were none. On or about March 6, 2007, the Insurer again, identifying the inquiry as "imperative," asked the Adjuster whether there was a mortgage on the property. *Id*. at 710. Again, the Adjuster failed to inform the Insurer of Intervest's mortgage. On March 19, 2007, the Insurer issued its final claim payment for the loss suffered by the Villas, without protecting the mortgagee's rights.

Throughout this period, the Adjuster stored documents concerning its adjustment work for the Villas in two locations. It kept some documents in a working file that one employee took with him as he travelled between various cities in Florida and Duluth, Minnesota. It kept other documents in an "office file" in the Adjuster's office in Palm Harbor, Florida. *Id*. at 996. The travelling employee eventually delivered the working file, which comprised two banker boxes of documents, to the Adjuster's Palm Harbor office. The Adjuster's

6

employee Dennis Martin testified that it "closed its file" for the Villas circa May 8, 2007. *Id.* at 998.

After May 8, 2007, the Adjuster continued to treat the Insurer as a "client." *Id.* at 756. In relation to the Villas loss, it "reach[ed] out to" the Insurer on several occasions to bill the Insurer for services, *id.* at 983, and to use the Insurer's attorneys. Martin testified that the Adjuster conducted itself in this manner because it had an "ongoing relationship with [the Insurer] even to this day [February 11, 2016]." *Id.* at 756. In August or September of 2007, the Adjuster advised the Insurer that another insurer of the Villas had requested information about the Insurer's payment checks. The Insurer responded by discussing its payments with the other insurer. In 2009, the Adjuster again initiated contact with the Insurer, indicated that the Adjuster had received a subpoena for its complete files concerning the Villas, and "sought [the Insurer's] input" about the process of responding to the subpoena. *Id.* at 816. Martin explained that the Adjuster "reach[ed] out to" the Insurer after receiving the subpoena "because that's the proper thing to do," as the Adjuster was the Insurer's "agent for this loss." *Id.* at 983. Martin testified, "although the last – the payment check had been issued, if an issue

7

came up regarding the Villas and [its] client, [the Adjuster] had an obligation to tell [the Insurer] . . . ." *Id*.

Upon receiving the Adjuster's notification of its receipt of a subpoena, the Insurer replied by advising the Adjuster that it "would assist with [the Adjuster's] responsibility to produce their file." *Id*. at 817. The Insurer then retained a lawyer to "assist [the Insurer and the Adjuster] with the document production." *Id*. As a result, the Insurer "continued to incur expenses associated with the subpoena and production process on behalf of [the Adjuster] and [the Insurer]." *Id*. In response to the subpoena, the Adjuster produced two banker boxes of documents. The Adjuster failed to produce the document that identified the Intervest mortgage.[3]

In January 2011, the Insurer received a civil action summons naming it as a defendant in a lawsuit filed by Intervest. The Insurer's employee Richard Verna, who had worked on the final claim payment for the Villas loss, testified that, at the point when the Insurer received the summons, he had no knowledge of "what had happened to the actual Villas property," and that he

---

[3] Although this is not clear from the testimony, it appears that the "working file" of two banker boxes was produced but the Palm Harbor "office file" was not produced.

8

"had no reason to continue with tracking what was going on at that property." *Id.* at 818. He did not specify a time prior to January 2011 when he had stopped tracking the property.

Intervest's complaint asserted that the Villas' owners had failed to make mortgage payments, to pay their property taxes, or to use their insurance payments to repair the hurricane damage, and that Intervest had foreclosed on the property. After receiving the summons, the Insurer retained a new law firm to represent it in Intervest's lawsuit. The Insurer incurred legal fees and expended resources to formulate a defense and to conduct discovery and depositions, including depositions both of its own employees and of the Adjuster's employees.

On May 8, 2012, the Insurer's employee Verna was deposed for the first time. At this time, the Adjuster had still failed to produce the document in its Palm Harbor office file that identified Intervest as a mortgagee. In his deposition, Verna "emphatically denied" that either the Insurer or the Adjuster had "any knowledge" of Intervest's mortgage. *Id.* at 823-34.

Approximately four months later, the Adjuster's employee Martin was deposed. He testified that, in preparation for his deposition, the Adjuster

9

"searched the office again, just to be diligent, and we found [the document identifying the Intervest mortgage]." *Id.* at 982. The Adjuster turned over the document to the Insurer on August 31, 2012. The Insurer's attorneys prepared the Adjuster's employee Martin for the deposition of the Adjuster, which occurred on September 5, 2012. At the deposition, the Adjuster produced the document to Intervest. The following day, September 6, 2012, the Adjuster billed the Insurer for time spent on the deposition. Martin explained that the Adjuster billed the Insurer "because at that time this issue still involved the Villas property and the [] loss." *Id.* at 986. He testified that the Adjuster "still had that relationship with [the Insurer] regarding . . . the Villas loss even up until the time of 2012, at the time [the Adjuster was] billing [the Insurer] for services." *Id*. The Insurer paid the Adjuster the amount it owed on the bill.

On September 13, 2012, the Insurer's employee Verna was deposed a second time and cross-examined by at least five attorneys concerning his prior testimony in which he had denied both the Insurer's and the Adjuster's knowledge of the Intervest mortgage. The Insurer then reanalyzed its position in the Intervest lawsuit and concluded that it "was now exposed to the fact that it was on notice of the Intervest interest in the Villas property because

10

our agent, [the Adjuster], had that information in their file." *Id*. at 825. As a result, on February 7, 2013, the Insurer paid Intervest one million dollars as settlement of Intervest's claim. The Insurer incurred $250,002.89 in legal fees.

On October 21, 2013, the Insurer brought this action against the Adjuster for negligent failure to advise it about Intervest's interest as mortgagee. The Adjuster answered that the suit was time-barred, but did not plead a specific statute of limitations. The Insurer moved for summary judgment. The Adjuster again responded that the suit was time-barred, but did not identify Connecticut General Statutes § 52-577 as the applicable statute of limitations. Judge Shea then ordered briefing on timeliness. The parties agreed that Connecticut General Statutes § 52-577 imposes a three-year statute of limitations on the Insurer's negligence claim.

It is undisputed that the Insurer filed suit more than three years after the Adjuster first failed to inform it about the Intervest mortgage, and more than three years after the Insurer issued its final claim payment check. The Insurer argued that the Adjuster had engaged in a continuing course of conduct that tolled the statute of limitations until 2012, when the Adjuster finally revealed the document identifying Intervest as mortgagee. The

11

Adjuster argued in opposition that its relationship with the Insurer ended on March 19, 2007, when the Insurer issued its final settlement check, and that there was no continuing course of conduct. The case was tried before a jury, which found that the Adjuster had "engaged in a continuing course of conduct such that [its] duty to [the Insurer] continued in a manner that tolled the statute of limitations for enough time that [the Insurer's] claim is not time-barred." *Id*. at 85. The jury awarded the Insurer damages for negligence in the amount of $1,250,002.89.

The Adjuster then moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), arguing that the record contained insufficient evidence to support the jury's finding that a continuing course of conduct had tolled the statute of limitations. The district court noted a lack of guidance from the Connecticut courts as to what constituted a continuing course of conduct sufficient to toll the limitations period. Nonetheless, it ruled that no reasonable jury could have found the doctrine applicable here, and entered judgment for the Adjuster. The Insurer timely appealed.

**DISCUSSION**

The principal question on appeal is whether, construing the trial evidence in the light most favorable to the Insurer, a reasonable jury could conclude that the Adjuster engaged in a continuing course of conduct that tolled the statute of limitations at least through October 21, 2010, three years before the commencement of this action. Connecticut General Statutes § 52-577 imposes a three-year limitation on negligence claims that begins to run from "the date of the act or omission complained of." CONN. GEN. STAT. § 52-577. A continuing course of conduct will toll the statute if the defendant "(1) committed an initial wrong upon the plaintiff; (2) owed a continuing duty to the plaintiff that was related to the alleged original wrong; and (3) continually breached that duty." *Flannery v. Singer Asset Fin. Co.*, 94 A.3d 553, 570 (Conn. 2014) (en banc) (quoting *Witt v. St. Vincent's Med. Ctr.*, 746 A.2d 753, 757 (Conn. 2000)). Connecticut courts have found a continuing course of conduct where "there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act." *Id.* Whether an ongoing special relationship exists, and whether later related wrongful

13

conduct occurred, are questions of fact. *See Starkweather v. Patel*, 641 A.2d 809, 811-12 (Conn. App. Ct. 1994), *cert. denied*, 644 A.2d 918 (Conn. 1994). The continuing course of conduct doctrine is "conspicuously fact-bound." *Blanchette v. Barrett*, 640 A.2d 74, 85 (Conn. 1994), *overruled on other grounds by Grey v. Stamford Health Sys., Inc.*, 924 A.2d 831 (Conn. 2007). Nevertheless, "before the [continuing course of conduct] doctrine can *be applied*, a duty must first be found to have existed," which "is a question of law." *Golden v. Johnson Mem'l Hosp.*, 785 A.2d 234, 239 (Conn. App. Ct. 2001) (emphasis in original) (internal quotation marks omitted), *cert. denied*, 789 A.2d 990 (Conn. 2001).

**I. Ongoing Special Relationship:**

In the words of the Connecticut Supreme Court, Connecticut's "appellate courts have not defined precisely what constitutes a special relationship for purposes of tolling because the existence of such a relationship will depend on the circumstances that exist between the parties and the nature of the claim at issue." *Saint Bernard Sch. of Montville, Inc. v. Bank of Am.*, 95 A.3d 1063, 1077 (Conn. 2014). The Connecticut Supreme Court has offered guidance that a special relationship is "[*u*]*sually* . . . built upon a fiduciary or *otherwise* confidential foundation." *Id*. (emphasis added). At trial,

the district court instructed the jury that, in undertaking employment as the Insurer's agent, the Adjuster "had a special relationship of trust" with the Insurer. *Essex Ins. Co.*, 2016 WL 3198190, at \*10 (internal quotation marks omitted). Under Connecticut law, "[a]n agent is a fiduciary with respect to matters within the scope of [the] agency." *Taylor*, 149 Conn. at 552. To determine whether the Adjuster engaged in a continuing course of conduct, therefore, we must consider whether the record could support a finding that a special relationship existed in the tolling period. The Adjuster urges on us a number of bright-line rules, which it argues limit the circumstances in which a continuing special relationship may be found.

First, the Adjuster asks us to recognize a rule that the duties arising from a special relationship necessarily end when the specific object of that relationship ends. The Adjuster asserts that this view is supported by the ruling of *Flannery v. Singer Asset Finance Co.* that an attorney-client relationship ended when the discrete sale transaction for which the attorney had been hired was complete. 94 A.3d at 573. However, the *Flannery* court made that ruling "[p]ursuant to the clear terms of [a] retainer agreement," *id.*, which specified that the "scope of representation was limited to the sale

15

transaction" and the "relationship would terminate upon completion of the services associated with the transaction and final billing for that work," *id.* at 558. It is thus unclear whether that aspect of *Flannery*'s reasoning applies to cases not governed by such a contractual termination clause.

The Connecticut Supreme Court's opinions in *Grey*, 924 A.2d 831, and *Blanchette*, 640 A.2d 74, do not resolve this question because they address doctor-patient relationships and a separate doctrine known as the "continuous treatment doctrine." As a result, we are uncertain whether the reasoning of those cases should apply beyond the medical context. While *Blanchette* notes the similarities between the continuous treatment and continuing course of conduct doctrines, *see* 640 A.2d at 85, the Connecticut Supreme Court's more recent opinion in *Grey* emphasized that they are distinct, *see* 924 A.2d at 839 (explaining that the continuous treatment doctrine "focuses on the *plaintiff's* reasonable expectation . . . while the [continuing course of conduct doctrine] focuses on the *defendant's* duty to the plaintiff arising from [the defendant's] knowledge of the plaintiff's condition") (emphasis in original). The *Grey* court based its holding exclusively on the continuous treatment doctrine and noted that the continuing course of

16

conduct doctrine involves a separate analysis that can lead to different outcomes. *Id*. at 838-39.

We find that *Grey* does not control here because its discussion (in dicta) merely presents some non-exclusive factors that may *extend* a special relationship, and does not present any factors that *terminate* one. *See* 924 A.2d at 839 (observing that a defendant's suspicion of cancer, knowledge of a particular condition, or "reason to know" the plaintiff's need for monitoring, may trigger the continuing course of conduct doctrine). The *Blanchette* opinion, to the extent it is pertinent outside of the doctor-patient relationship, seems to argue against the Adjuster's position; *Blanchette* asserted, albeit in dicta, that the determination whether a special relationship had terminated depends on a non-exclusive list of factors including:

> the subjective views of the parties as to whether their relationship had terminated; the length of their relationship; the frequency of their interactions; the nature of the physician's practice; whether the physician had prescribed a course of treatment for or was monitoring the condition of the patient; whether the patient was relying upon the opinion and advice of the physician with regard to a particular injury, illness or medical condition; and whether the patient had begun to consult with another physician concerning the same injury, illness or medical condition. 640 A.2d at 86.

17

The application of these factors to this case would be entirely inconsistent (or at best difficult to reconcile) with the Adjuster's argument that a special relationship must end when the specific object of the relationship ends, as the factors enumerated could extend the special relationship beyond the achievement of the specific object of the relationship unless arbitrarily so limited.

Next, the Adjuster argues that only narrow circumstances may give rise to an ongoing special relationship, such as when the parties have a longstanding relationship. Our reading of Connecticut case law does not support this view. It is true that each case in which Connecticut's courts have found an ongoing special relationship identified some narrow circumstances in which such a relationship may be found. But we know of no Connecticut precedent holding that any particular circumstance is necessary to find an ongoing special relationship.

The district court reasoned that Connecticut law constrains a jury's discretion to find an ongoing special relationship in at least two circumstances. First, it asserted: "[s]ubsequent communication between parties alone does not extend a special relationship." *Essex Ins. Co.*, 2016 WL

3198190, at *12. In support, the district court cited the finding in *Flannery* that an ongoing special relationship was not established when an attorney's former client contacted him to seek tax advice, and the attorney responded by providing a referral. *See id*. (citing *Flannery*, 94 A.3d at 559-60).

We do not find the district court's view persuasive. In *Flannery*, the plaintiff had retained an attorney to represent him in a sale of lottery payments to the defendant, and the attorney had failed to disclose his simultaneous representation of the defendant. *Id*. at 557-59. The plaintiff alleged that the defendant aided and abetted the attorney in a breach of fiduciary duty. *Id*. at 557. The *Flannery* court did not decide whether the attorney's conduct could be imputed to the defendant for purposes of tolling the aiding and abetting claim (though it commented that the limited jurisprudence on the issue suggested not). *Id.* at 567 n.23. Instead, the court reasoned that "the undisputed facts show no continuing course of conduct by *either* the defendant or [the attorney]." *Id.* at 570 (emphasis in original). The defendant had never had a special relationship with the plaintiff, owed no duty to the plaintiff, had no contact with the plaintiff following the sale transaction, and engaged in no acts relevant to tolling. *Id*. As to the attorney,

19

after the attorney-client relationship terminated, *id.* at 558-59, 558 n.9, he never initiated contact with the plaintiff. *See id.* at 559-60. His sole related subsequent act was to provide a referral in response to the former client's request. *Id.* at 568. It is doubtful that the referral qualified as a wrongful act. *Id.* at 571 n.26. Regardless, the referral occurred after the statute of limitations had expired, so "it was of no consequence for tolling purposes." *Id.* at 568. And any continuing duties that the attorney may have owed to the plaintiff as his former client did not include an indefinite duty to disclose his prior conflict of interest. *Id.* at 573 n.28. The *Flannery* court, further, rejected the contention that the attorney had extended his special relationship with the plaintiff when, contemporaneous to the sale transaction, he offered to represent the plaintiff again in the future. *Id.*

    *Flannery* thus establishes that a plaintiff is not entitled to tolling solely by showing that a former client contacted his former attorney and received a referral in response, where the interaction occurred after the statute of limitations had expired. It does not hold that subsequent communication between the parties alone never suffices to extend a special relationship. Indeed, the *Flannery* court contemplated that subsequent communication can

20

be highly relevant to a continuing course of conduct inquiry in characterizing the doctrine, in the attorney-client context, as "largely . . . inapplicable when the legal representation at issue has come to a close and there is *no further contact* between the parties." *Id*. at 573 (emphasis added). Here, there was repeated further contact between the parties, including contact initiated by the Defendant.

More broadly, we see no reason why communications between the parties should be insufficient to establish a continuing course of conduct. Relationships are generally defined or affected by communication between the parties. Under the district court's view, a statement by the Adjuster to the Insurer saying, "We will continue to work on your behalf on the matter, to exercise fiduciary duties in your favor, to treat you as a client, and to bill you for our time and expenses incurred on your behalf," would be inadequate to extend the duration of the special relationship. This seems to us to be neither logical nor mandated by Connecticut court opinions. Furthermore, the proposition that the fact of communication between the parties *without more* is insufficient to establish a continuing course of conduct is irrelevant to this case because the Insurer was not relying on the fact of communication alone

to support the existence of a continuing course of conduct. It relied in addition on actions, such as the Adjuster's use of the Insurer's attorney, its billing the Insurer for its time and legal expenses incurred in responding to the subpoena, and the Insurer's payment of those bills, as well as on testimony of the parties characterizing the relationship.[4]

Second, the district court asserted that an ongoing special relationship must continue the "*original* duty of care" that applied at its inception. *Essex Ins. Co.*, 2016 WL 3198190, at *13 (emphasis in original). Otherwise put, it was the district court's view that an ongoing special relationship requires not only the continuation of *a* special relationship, but the continuation of *the* identical special relationship as previously existed. We find no such limitation in the Connecticut case law. To be sure, the precedents require that the defendant

---

[4] On appeal the Adjuster also directs our attention to *Sanborn v. Greenwald*, 664 A.2d 803, 808 (Conn. App. Ct. 1995), *cert. denied* 666 A.2d 1186 (Conn. 1995). *Sanborn* fails to clarify the issue whether the fact of communication between the parties, without more, is insufficient to establish a continuing course of conduct. In *Sanborn*, the court, in rejecting the plaintiff's contention of a continuing course of conduct, observed that communications by the plaintiff to the defendant, without more, could not establish that the defendant undertook a continuing duty. *See id*. Sanborn is not pertinent because Plaintiff here was not relying solely on its own communications to the Defendant to establish the continuing relationship. It relied on the Defendant's conduct, communications, and subsequent characterization of the relationship as well.

"owed a continuing duty to the plaintiff that was *related* to the alleged original wrong," and the same precedents have held that a special relationship may "giv[e] rise to such a continuing duty." *Flannery*, 94 A.3d at 570 (emphasis added). But that language does not appear to preclude the extension of a special relationship between the parties here. The requirement that the continuing duty be related to the original wrong is not the same as a requirement that the ongoing special relationship be identical in nature to the original relationship. Indeed, the fact that Connecticut law also supports a finding of a continuing course of conduct where there is no special relationship at all, but where the defendant engages in subsequent related wrongful conduct, *id.*, suggests that a continuing duty may be found in circumstances where the parties' relationship has evolved.

Furthermore, we see no logical reason why a relationship that takes different forms at different times could not give rise to a duty that continues across each instantiation. Consider a circumstance in which the Adjuster had discovered the existence of the mortgage on the Villas a few days after the supposed termination of the original relationship, when the Insurer would still have been able to recover its loss by suing the wrongful payee to recoup

23

the wrongful payment. Would the Connecticut courts say that the Adjuster had no duty whatsoever to tell the Insurer that fact, and would have committed no wrong by failing to do so? If instead the Connecticut courts would conclude that the Adjuster did have a continuing duty in that circumstance, would not that duty have remained in existence despite the transition of the Insurer's relationship with the Adjuster from that of client to that of former client?

In sum, we find no support in Connecticut precedent for the Adjuster's argument in favor of bright-line rules limiting the circumstances in which a continuing special relationship may be found. The following evidence seems to give some support to the existence of a continuing special relationship after the Insurer issued its final check, consistent with the Connecticut authority cited to us.

At the inception of the parties' relationship, the Adjuster owed the Insurer both a general fiduciary duty and a specific duty to inform the Insurer of any mortgagees for the Villas. After the Insurer issued its final claim settlement check, the Adjuster initiated contact with the Insurer at least three times: in August or September of 2007, in 2009, and in 2012. During this

24

period, the Adjuster billed the Insurer for services, used the Insurer's attorneys, treated the Insurer as its "client," App'x at 756, and considered itself the Insurer's agent for the Villas loss. The Adjuster also acknowledged in its testimony that it had a continuing "obligation to tell" the Insurer about any issues that "came up" concerning the client and the property. *Id.* at 983. The Adjuster's employee testified that the Adjuster had an "ongoing relationship with [the Insurer] . . . [e]ven to this day," *id.* at 756, referring to the date of testimony on February 11, 2016. The Insurer continued to rely on the Adjuster's representations that there was no mortgage on the Villas at least through May 8, 2012, when the Insurer's employee Verna was first deposed in the Intervest lawsuit. The Adjuster was almost certainly aware of the Insurer's reliance on its representations up to and including May 8, 2012, as the parties were in ongoing communication both before and after Verna's first deposition.

Such facts seem to us arguably sufficient to support a finding that a special relationship continued between the Adjuster and the Insurer at least through October 21, 2010, which would render the Insurer's claim timely. We recognize, however, that the "special relationship" prong of the continuous

25

course of conduct doctrine could be amenable to a different reading. As the precedents do not provide clear answers, and the parties have consented to certification, we seek the guidance of the Connecticut Supreme Court whether the record supports a finding of an ongoing special relationship.

**II. Later Wrongful Conduct:**

In the alternative, a continuing course of conduct may be established by showing "some later wrongful conduct of a defendant related to the prior act." *Flannery*, 94 A.3d at 570. The Connecticut Supreme Court has clarified that "later wrongful conduct may include acts of omission as well as affirmative acts of misconduct." *Id*. (internal quotation marks omitted). A later omission must be independently wrongful; mere failure to correct an earlier omission does not necessarily establish later wrongful conduct. *See id*. at 575.[5] Further, for a series of subsequent wrongful omissions to trigger the continuing course of conduct doctrine, the series must be more than a

---

[5] At least one Connecticut appeals court has held that, where the parties had an ongoing agency relationship, a defendant's repeated failure to inform the plaintiff of an earlier error constituted a series of later related wrongful omissions. *Vanliner Ins. Co. v. Fay*, 907 A.2d 1220, 1231-32 (Conn. App. Ct. 2006). That opinion does not resolve our inquiry because *Vanliner* addressed wrongful conduct in the context of an ongoing special relationship, whereas here it is unclear whether an ongoing special relationship existed.

collection of "repeated events giv[ing] rise to discrete injuries . . . [In such a case] the damages from each discrete act . . . would be readily calculable without waiting for the entire series of acts to end. There would be no excuse for the delay. And so the violation would not be deemed 'continuing.'" *Watts v. Chittenden*, 22 A.3d 1214, 1222 (Conn. 2011) (quoting *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001)) (internal citations omitted).

Beyond these minimal contours, Connecticut case law does not clarify the scope of a jury's discretion to find a continuing course of conduct based on later related wrongful conduct. As the district court noted, "a dearth of analogous case law . . . make[s] it difficult to predict . . . how broadly the phrase 'later wrongful conduct related to the original wrong' sweeps." *Essex Ins. Co.*, 2016 WL 3198190, at *17. It is not clear to us whether the Connecticut Supreme Court intends that the subsequent wrongful act needs to be wrong in the sense of breaching the same duty as the original wrong, or whether other wrongful conduct that is related to the original wrong would suffice. The Connecticut Supreme Court's opinion in *Watts* seems to suggest the latter because there, outside the negligence context, wrongful conduct sufficed to toll the statute even though the conduct occurred after the dissolution of the

marriage that had constituted the parties' initial relationship, and there was no original duty between the parties. *Watts*, 22 A.3d at 1221, 1227-28.

In arguing for tolling, the Insurer contends that the Adjuster's conduct in any event would qualify as wrongful conduct "related to the [alleged original wrong]." *Flannery*, 94 A.3d at 570. The following evidence before the jury seems to us relevant to the question. The Adjuster's employee testified that the Adjuster had a continuing "obligation to tell" the Insurer about any issues that "came up" regarding the Villas property. App'x at 983. The Adjuster continued to bill the Insurer for services, to refer to the Insurer as its "client," *id*. at 756, to serve as the Insurer's agent for the Villas loss, and to use the Insurer's attorneys in 2009 and 2012. There are at least three post-2007 moments when an issue came up regarding the Villas: the Adjuster's receipt of the 2009 subpoena, the Insurer's January 2011 receipt of the civil summons, and Verna's May 8, 2012 deposition. Each of these events, separately and cumulatively, could have put the Adjuster on notice that something was amiss with its loss adjustment work. Yet, throughout, the Adjuster failed to inform the Insurer about Intervest's interest as a mortgagee. The Insurer suffered injury by incurring legal fees, first to assist the Adjuster's

response to the 2009 subpoena and then to respond to Intervest's 2011 civil summons. The Insurer's conduct throughout the action, including its response to the 2009 subpoena and its initial response to the 2011 civil summons, was a direct result of the Adjuster's 2007, 2009, 2011, and 2012 omissions.

*     *     *

The issue is whether the record contains sufficient evidence to support the jury's verdict that a continuing course of conduct tolled the statute of limitations, Connecticut General Statutes § 52-577. As the parties have consented to certification, we hereby certify to the Supreme Court of Connecticut the question whether the evidence put to the jury was legally sufficient to support the jury's finding that the statute of limitations was tolled, rendering the Insurer's suit against the Adjuster timely.

**CONCLUSION**

We hereby respectfully certify to the Connecticut Supreme Court the following question: Is the trial evidence legally sufficient to support the jury's

finding that the statute of limitations was tolled at least through October 21, 2010, rendering the Insurer's claim timely?

It is hereby ORDERED that the Clerk of this Court transmit to the Clerk of the Connecticut Supreme Court a Certificate, as set forth below, together with a complete set of the briefs, appendix, and record filed in this Court by the parties. The parties are directed to bear equally such fees and costs as may be directed by the Connecticut Supreme Court.

This panel retains jurisdiction so that after we receive a response from the Connecticut Supreme Court we may dispose of the appeal.