******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

The plaintiff insurance company appealed to the United States Court of
Appeals for the Second Circuit from the judgment, rendered by the
United States District Court for the District of Connecticut, for the
defendant claims adjuster after the District Court set aside the jury's
verdict in favor of the plaintiff on the ground that there was insufficient
evidence to support the jury's finding that a continuing course of conduct
tolled the statutory (§ 52-577) three year limitation period applicable to
the plaintiff's action. In 2005, a hurricane damaged certain commercial
property owned by the plaintiff's insured. The plaintiff hired the defen-
dant as its independent adjuster. As the plaintiff's adjuster, the defendant
was responsible for, inter alia, inspecting the property, estimating and
working with the insured to determine the value of the loss, and identi-
fying any mortgages on the insured property. In 2006, the insured's
retail broker sent a letter to O, the individual adjuster assigned by the
defendant to the insured's claims. That letter included, on the reverse
side, a schedule listing the mortgages on all of the insured's properties,
including a mortgage on the property at issue and the name of the
mortgagee. Prior to issuing the final insurance claim payment in March,
2007, to the insured for the property damage, the plaintiff received
assurances from O and M, also an employee of the defendant, that there
were no mortgages on the property. In 2009, the bank that held the
mortgage on the property brought an action against third parties, includ-
ing the defendant, alleging that they failed to protect its interest in the
property. M notified the plaintiff of the bank's action, and the plaintiff
offered to assist the defendant with its responsibility to produce docu-
ments and other evidence, including covering the defendant's legal
expenses related to that action. In 2010, the bank amended its complaint
to add the plaintiff as an adverse party, alleging that the plaintiff knew
that the bank held a mortgage on the property and should have issued the
insurance proceeds directly to the bank. M was subsequently deposed
in the bank's action, and, in preparing for the deposition in 2012, M
discovered in the defendant's files the letter containing the schedule
showing that the bank held a mortgage on the property. The plaintiff,
concerned that the defendant's knowledge of the schedule could be
imputed to it, settled the bank's claims against it for $1 million. There-
after, in October, 2013, the plaintiff brought the present action to recover
damages from the defendant for its negligence in failing to advise it of
the mortgage on the property before it issued the final claim payment
to the insured. The plaintiff claimed that the defendant's continuing
course of conduct tolled the three year limitation period for commencing
the action until the defendant discovered and produced the schedule
showing the mortgage during the course of the litigation between the
bank and the plaintiff. The District Court instructed the jury regarding
the defendant's alleged breach of its continuing duty under two theories,
first, that, pursuant to a special relationship between the plaintiff and
the defendant, the defendant had a continuing duty to disclose the
existence of the mortgage, and, second, under a theory of the defendant's
later wrongful conduct in continuing to fail to disclose the existence of
the mortgage. Following the plaintiff's appeal to the Second Circuit,
that court concluded that Connecticut law regarding the parameters of
the tolling doctrine were unclear and sought this court's advice, by way
of certification pursuant to statute (§ 51-199 [b]), whether the evidence
was legally sufficient to support a finding by the jury that the applicable
limitation period was tolled by a continuing course of conduct through
the three year period before the plaintiff commenced the present
action. *Held*:

1. The evidence was not legally sufficient to establish that the defendant

had a continuing duty to the plaintiff on the basis of a special relationship between the parties that continued until at least three years before the plaintiff commenced the present action in October, 2013, thereby tolling the statute of limitations, as none of the defendant's actions after the plaintiff issued the final claim payment in 2007 reasonably could be considered further performance of any of the adjustment services the parties had agreed on and, thus, a further continuation of the fiduciary relationship that existed prior to that time: the defendant closed its file on the property shortly after the plaintiff issued the final claim payment, signifying that it had completed its performance of the adjustment services for which it had been hired, any actions by the defendant thereafter, including communications, were not adjustment services, and the defendant's acts in billing to the plaintiff M's time spent in connection with the bank's action and using the plaintiff's attorney reflected a business relationship but did not bear the hallmarks of agency generally or a fiduciary relationship specifically; moreover, the plaintiff could not prevail on its claim that the defendant had a continuing duty to warn of or correct a mistake after the termination of the special relationship, as there was no basis on which the jury reasonably could have concluded that the defendant had actual knowledge of the bank's mortgage on the property before 2012, when M discovered the schedule showing that the bank held a mortgage on the property, as both O and M testified that they had no recollection of ever having seen the schedule during the relevant time frame, and the plaintiff's theory of the case was premised on the defendant's constructive knowledge, not its actual knowledge, of the bank's mortgage.

2. The evidence adduced at trial was not legally sufficient to support a finding by the jury that the statute of limitations was tolled through at least October, 2010, under the continuing course of conduct doctrine on the basis of later wrongful conduct relating to the defendant's prior omission: this court rejected the plaintiff's claim that the defendant's ongoing failure to disclose the existence of the bank's mortgage on the property constituted later wrongful conduct that continued until M's 2012 disclosure of the schedule, as the defendant did not have actual knowledge of that schedule until 2012, and the plaintiff did not identify any other action by the defendant that constituted later wrongful conduct; moreover, this court declined to recognize a continuing duty of the defendant to investigate as long as any business relationship existed between the parties, as an agent's duty to use reasonable efforts to give the principal information that is relevant to the affairs entrusted to the agent generally ends with the termination of the agency relationship.

Argued October 16, 2018—officially released April 23, 2019

*Procedural History*

Action to recover damages for the alleged negligence of the defendant, and for other relief, brought to the United States District Court for the District of Connecticut, and tried to the jury before *Shea, J.*; verdict and judgment for the plaintiff; thereafter, the court granted the defendant's motion for judgment as a matter of law and rendered an amended judgment thereon, from which the plaintiff appealed to the United States Court of Appeals for the Second Circuit, *Leval, Raggi* and *Lohier, Js.*, which certified to this court a question of law regarding whether the evidence was sufficient to support the jury's finding that a continuing course of conduct tolled the statute of limitations.

*Mary Massaron*, pro hac vice, with whom was *Christopher L. Jefford*, for the appellant (plaintiff).

*Richard A. Simpson*, pro hac vice, with whom, was *Christopher P. Kriesen*, for the appellee (defendant).

*Opinion*

McDONALD, J. This case, which comes to us on certification from the United States Court of Appeals for the Second Circuit; see General Statutes § 51-199b (d); requires us to consider the applicability of our continuing course of conduct tolling doctrine to a relationship between an insurance company and its independent claims adjuster in the period after an insured's claim has been fully paid. The plaintiff insurer, Essex Insurance Company, brought a negligence action against the defendant claims adjuster, William Kramer & Associates, LLC, in the United States District Court for the District of Connecticut, alleging that the defendant had breached its duty to advise the plaintiff of a mortgage on the insured property before the plaintiff issued the final claim payment check to the insured for hurricane related damage, thereby causing the plaintiff to incur liability to the mortgagee. The plaintiff contended that the limitation period for commencing an action was tolled until the defendant discovered and produced a document in one of its files that reflected the mortgagee's interest during the course of litigation between the mortgagee and the plaintiff. The District Court set aside the jury's verdict in favor of the plaintiff on the ground that there was insufficient evidence to support the jury's finding that a continuing course of conduct tolled the otherwise untimely filed action. See *Essex Ins. Co.* v. *William Kramer & Associates, LLC*, United States District Court, Docket No. 3:13-cv-1537 (MPS) (D. Conn. June 8, 2016). The Second Circuit concluded that Connecticut law regarding the contours of this tolling doctrine is unclear and sought our advice as to whether the evidence is legally sufficient to support the jury's finding. See *Evanston Ins. Co.* v. *William Kramer & Associates, LLC*, 890 F.3d 40 (2018).[1] We conclude that the evidence is not legally sufficient to toll the statute of limitations on this factual record.

The District Court's decision set forth the following facts that the jury reasonably could have found, which, for context, we supplement with uncontested facts reflected in the record certified to this court. In 2005, a hurricane damaged properties in Florida, including four commercial properties owned by IDM Management, Inc. The property directly relevant to the present action is an apartment complex, The Villas at Lauderhill, LLC, known as the "Villas." IDM had several layers of insurance to protect itself against such a loss for its properties: an initial layer of coverage from Aspen Specialty Insurance Company; an excess layer from the plaintiff; and an additional excess layer from a third insurer.[2] The plaintiff received notice from IDM that the loss might reach the plaintiff's layer of coverage.

After Aspen hired the defendant to adjust the loss to the IDM properties for its initial layer of coverage, the plaintiff agreed to hire the defendant as its independent

adjuster for the IDM properties. It is customary industry practice for excess layer insurers to engage the same independent adjuster as the initial layer insurer to allow all insurers to share the information and work product generated in the original adjustment.

The plaintiff hired the defendant to perform a " 'full adjustment' " on the properties. Although the parties did not execute a written contract, it was understood that a full adjustment included inspecting the property, estimating the value of the loss, working with IDM to agree to an amount of loss, reviewing all coverage aspects of the plaintiff's policy, identifying any potential coverage issues, and reporting all elements associated with the investigation and the claim measuring process. Significantly, for purposes of the present case, it also included identifying any mortgages on the insured property. The need to identify such mortgages stemmed from the fact that the mortgagee could have an interest in the insurance proceeds.

Two of the defendant's employees were involved with the adjustment of IDM's claims: Dennis D. Martin, the defendant's general executive adjuster who had solicited the plaintiff's business, and Robert Oberpriller, the defendant's general adjuster. Oberpriller did the work in the field, traveling between his home in Minnesota and the damaged properties in Florida. Because those properties were approximately 250 miles from the defendant's closest Florida offices, Palm Harbor and Tampa, and Oberpriller did not work out of those offices, he kept a "working file" with him.

In April, 2006, IDM's retail broker sent a letter to the defendant's Palm Harbor office addressed to Oberpriller, requesting reissuance of a check from Aspen for one of IDM's properties because the banks listed as payees were incorrect. The letter provided the names of the correct payees and noted, "I have also enclosed a copy of the mortgagees showing Wachovia Securities for Park Apartments for your files."

The enclosed document, captioned "schedule of mortgagees," did not list mortgagees for just Park Apartments, but for all four IDM properties. Intervest National Bank was listed last as mortgagee for the Villas. The letter from IDM's retail broker and its accompanying schedule of mortgagees were placed in a file in either the Palm Harbor or Tampa office (Aspen file).[3]

Even though the defendant had the mortgagee schedule in its Aspen file and was obligated to share information obtained while working for Aspen, Oberpriller and Martin sent periodic status reports to the plaintiff indicating that there were mortgages on the other three IDM properties but that there was no mortgage on the Villas.[4] Just before the plaintiff issued its final claim payment check to IDM, the plaintiff's executive claims examiner contacted Oberpriller and Martin specifically

to inquire whether there was a mortgage on the Villas. They replied that they had not received a response from the policyholder in their most recent inquiry, but there was "no indication" that there was a mortgage on the Villas. Because the plaintiff's executive claims examiner was not licensed in Florida as an insurance adjuster, he could not contact IDM directly on this matter. As a result, when the plaintiff issued the final claim payment check to IDM on March 19, 2007, exhausting IDM's policy limit, it did not list Intervest as a payee or inform Intervest that it was going to make its final claim payment.

The defendant closed its file on the Villas claim on May 8, 2007. At some point around that date, Oberpriller delivered his working file on the IDM properties, consisting of two boxes of documents, to the defendant's Palm Harbor office.

After the plaintiff issued the final claim check, there were three instances of contact between the defendant and the plaintiff relating to the Villas. First, in August or September, 2007, Martin contacted the plaintiff to inform it that the insurance company holding the final excess layer of coverage on the Villas had inquired as to whom the plaintiff had issued its payment checks. In response, the plaintiff's executive claims examiner contacted that insurer.

Second, in 2009, after Intervest, the mortgagee on the Villas, brought an action against third parties concerning their failure to protect its mortgage interest (Intervest action),[5] Martin informed the plaintiff that Intervest had served the defendant with a subpoena, demanding production of the defendant's files relating to the Villas. Martin did so because he believed that the defendant had an obligation to inform the plaintiff if an issue came up that could affect the plaintiff. The plaintiff offered to assist with the defendant's production responsibility and had its attorney who had assisted in the loss adjustment process open her files to do so. The plaintiff also offered to cover the defendant's expenses related to the Intervest action.

In response to the 2009 subpoena, the defendant produced the two boxes of documents that Oberpriller had returned to the office after he completed the adjustment. It did not produce the Aspen file containing the mortgagee schedule at that time.

In December, 2010, Intervest filed an amended complaint in the Intervest action, adding the plaintiff as a defendant; civil process was served on the plaintiff in January, 2011. The amended complaint alleged, among other things, that the plaintiff knew that Intervest was a mortgagee on the Villas and should have paid insurance proceeds to Intervest.

The third contact between the parties occurred in 2012, when Martin informed the plaintiff that he was

being deposed in the Intervest action. Thereafter, while Martin was preparing for his deposition, his secretary came upon the Aspen file when the offices were searched again, "just to be diligent."[6] Martin, in turn, disclosed to the plaintiff the existence of the mortgagee schedule in that file. The plaintiff's attorney prepared Martin for, and attended, the deposition. Martin produced the schedule to Intervest at his deposition. Thereafter, the defendant billed the plaintiff for the time that Martin spent at his deposition because, according to Martin, the defendant still considered the plaintiff its "client" and continued to have an "ongoing relationship" with the plaintiff.

On the basis of the discovery of the mortgage schedule in the Aspen file and the concern that the defendant's knowledge of this information could be imputed to it, the plaintiff reevaluated its litigation strategy. Ultimately, the plaintiff settled Intervest's claims against it for $1 million. By that time, the plaintiff had incurred approximately $250,000 in legal fees, between its own costs and those incurred aiding the defendant.

The record reveals the following additional procedural history. On October 21, 2013, the plaintiff instituted the present negligence action against the defendant. The defendant contended that the action was time barred because it had been filed beyond the applicable three year limitation period;[7] see General Statutes § 52-577; as measured from the date the plaintiff issued the final check to IDM in March, 2007. The case was submitted to the jury with special instructions on that issue and on the continuing course of conduct tolling doctrine invoked by the plaintiff in response. The jury returned a verdict in favor of the plaintiff, awarding damages for the settlement and legal fees incurred. In its interrogatories, the jury found that the action had been filed more than three years after the act(s) on which it was based, but that the defendant had "engaged in a continuing course of conduct such that [the defendant's] duty to [the plaintiff] continued in a manner that tolled the statute of limitations for enough time that [the plaintiff's] claim is not time barred . . . ."

The defendant renewed a prior motion for judgment as a matter of law, previously reserved by the court, arguing that no reasonable jury could find that the continuing course of conduct doctrine applied under the facts of the case. The District Court agreed, set aside the jury's verdict, and rendered judgment for the defendant.

The plaintiff appealed to the Second Circuit. That court agreed with an observation made by the District Court that Connecticut law did not provide clear guidance in this context, but it questioned the District Court's application of the case law to the facts. With the parties' agreement, the Second Circuit sought our guidance by way of certification on the following ques-

tion: "Is the trial evidence legally sufficient to support the jury's finding that the statute of limitations was tolled at least through October 21, 2010, [three years before the action was commenced and thus] rendering the [plaintiff's] claim timely?" *Evanston Ins. Co.* v. *William Kramer & Associates, LLC*, supra, 890 F.3d 51. We agree with the District Court's determination that the evidence was not legally sufficient.

Section 52-577 provides: "No action founded upon a tort shall be brought but within three years from the date of *the act or omission complained of*." (Emphasis added.) This court has explained that "the history of that legislative choice of language precludes any construction thereof delaying the start of the limitation period until the cause of action has accrued or the injury has occurred. . . . The date of the act or omission complained of is the date when the . . . conduct of the defendant occurs . . . ." (Citation omitted; internal quotation marks omitted.) *Certain Underwriters at Lloyd's, London* v. *Cooperman*, 289 Conn. 383, 408, 957 A.2d 836 (2008); see also *Rosato* v. *Mascardo*, 82 Conn. App. 396, 407, 844 A.2d 893 (2004) (characterizing § 52-577 as statute of repose). As such, "an action commenced more than three years from the date of the negligent act or omission complained of is [time] barred . . . regardless of whether the plaintiff had not, or in the exercise of [reasonable] care could not reasonably have discovered the nature of the injuries within that time period." (Internal quotation marks omitted.) *Martinelli* v. *Fusi*, 290 Conn. 347, 355, 963 A.2d 640 (2009).

However, the continuing course of conduct doctrine recognizes that the "act" or "omission" that commences the limitation period may not be discrete and attributable to a fixed point in time. "[T]he doctrine is generally applicable under circumstances where [i]t may be impossible to pinpoint the exact date of a particular negligent act or omission that caused injury or where the negligence consists of a series of acts or omissions and it is appropriate to allow the course of [action] to terminate before allowing the repose section of the [limitation period] to run . . . ." (Internal quotation marks omitted.) *Rosenfield* v. *Rogin, Nassau, Caplan, Lassman & Hirtle, LLC*, 69 Conn. App. 151, 160–61, 795 A.2d 572 (2002).

"[T]o support a finding of a continuing course of conduct . . . there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. . . . Where we have upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of *either* a special relationship between the parties giving rise to such a continuing duty *or* some later wrongful conduct of a defendant

related to the prior act." (Emphasis added; internal quotation marks omitted.) *Saint Bernard School of Montville, Inc.* v. *Bank of America*, 312 Conn. 811, 835, 95 A.3d 1063 (2014); accord *Connell* v. *Colwell*, 214 Conn. 242, 255, 571 A.2d 116 (1990); see also *Martinelli* v. *Fusi*, supra, 290 Conn. 357 (plaintiff must establish that "the defendant: [1] committed an initial wrong upon the plaintiff; [2] owed a continuing duty to the plaintiff that was related to the alleged original wrong; and [3] continually breached that duty" [internal quotation marks omitted]).

In the present case, the plaintiff claims that the defendant engaged in a continuing course of conduct that tolled the limitation period until the defendant produced the mortgagee schedule from the Aspen file in September, 2012. It contends that the defendant breached a continuing duty to disclose the existence of the mortgage arising from either the special relationship between the parties or the defendant's later wrongful conduct in continuing to fail to make this disclosure. The District Court instructed the jury regarding continuing duty under both a theory of a special relationship and a theory of later wrongful conduct. The interrogatories did not ask the jury to specify which theory the evidence supported. Therefore, we must consider whether the evidence was legally sufficient under either theory to establish that the defendant's duty to disclose the mortgage remained in existence through at least October 21, 2010. See *MacDermid, Inc.* v. *Leonetti*, 328 Conn. 726, 752, 183 A.3d 611 (2018) (applying general verdict rule).

I

We begin with the special relationship theory. The plaintiff advances two grounds for prevailing on this theory. We consider each in turn.

A

The jury was instructed that, as an adjuster hired by the plaintiff, the defendant was the plaintiff's agent and therefore had a special relationship of trust with the plaintiff. The question presented to the jury, therefore, was whether this special relationship continued until at least three years before the action was commenced in October, 2013. Although the defendant challenged at trial the instruction that a special relationship of trust had been created, it abandoned that claim on appeal. Therefore, our analysis is limited to the question presented to the jury.

As the federal courts noted in this case, there is a dearth of Connecticut appellate jurisprudence applying this theory. Most of the case law addressing special relationships as a basis for tolling involves medical malpractice and, to a lesser extent, legal malpractice. Specific tolling doctrines are available for those relationships—the continuous treatment doctrine and

the continuous representation doctrine. The Second Circuit questioned the extent to which it is appropriate to rely on continuous treatment cases for guidance when analyzing a case under the continuing course of conduct doctrine because of certain differences between the doctrines.

The doctrines differ in certain important respects but "share similar supporting rationales." *Martinelli* v. *Fusi*, supra, 290 Conn. 356; see *Sean O'Kane A.I.A. Architect, P.C.* v. *Puljic*, 148 Conn. App. 728, 734, 87 A.3d 1124 (2014) (doctrines "present similar solutions to similar problems"). The primary difference is that the continuous treatment doctrine focuses on the plaintiff's reasonable expectation that the treatment for an existing condition will be ongoing, whereas the continuing course of conduct doctrine is available regardless of the plaintiff's knowledge of any reason to seek further treatment, as long as the defendant had reason to know that the plaintiff required ongoing treatment or monitoring for a particular condition. *Martinelli* v. *Fusi*, supra, 356–57. Thus, insofar as continuous treatment cases weigh various factors to assess the plaintiff's subjective expectations, we have declined to extend that approach to other tolling doctrines. See *DeLeo* v. *Nusbaum*, 263 Conn. 588, 598–99, 821 A.2d 744 (2003) (determining that it is not appropriate to weigh such factors to determine whether legal representation is ongoing, and expressing concern that weighing promotes uncertainty of application). Accordingly, continuous treatment cases may provide some useful guidance as to the policies and outcomes intended but should not be relied on as authority for the circumstances under which special relationships terminate under the continuing course of conduct doctrine.

The present case provides an opportunity to examine the parameters of special relationships governed exclusively by the more general continuing course of conduct doctrine. As this court previously has explained, "[u]sually, such a special relationship is one that is built upon a fiduciary or otherwise confidential foundation. A fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other. . . . The superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him. . . . Fiduciaries appear in a variety of forms, including agents, partners, lawyers, directors, trustees, executors, receivers, bailees and guardians." (Citations omitted; internal quotation marks omitted.) *Saint Bernard School of Montville, Inc.* v. *Bank of America*, supra, 312 Conn. 835–36.

The question in the present case, however, is not whether an agency relationship existed, but whether an existing agency relationship and any attendant fiduciary

duties[8] continued after the final claim check was issued. As we have noted in the context of continuous legal representation, there may be a formal or a de facto termination of the relationship as it pertains to the matter at issue. See *DeLeo* v. *Nusbaum*, supra, 263 Conn. 597. A formal termination may arise pursuant to contractual terms or communication to that effect, or may result when the matter for which the defendant was hired comes to a conclusion. See id. A de facto termination arises by conduct inconsistent with the special relationship created. See id.

In addition to the possibility that a special relationship may terminate altogether, the relationship may change from its original form. "That a relationship of agency exists does not foreclose the possibility that it may be preceded or followed by another type of legal relationship between the same parties, nor does it foreclose the possibility that another type of legal relationship may exist contemporaneously between the same parties or that the character of a relationship may evolve over time." 2 Restatement (Third), Agency § 8.01, comment (c), p. 256 (2006); see also *DeLeo* v. *Nusbaum*, supra, 263 Conn. 594 (tolling under continuous representation doctrine requires not only that attorney continue to represent client but also that representation be related to same transaction or subject matter as allegedly negligent acts). Therefore, in the present case, it may be necessary to consider not only whether the parties' special relationship terminated but also the nature of any relationship that existed after the final check was issued by the plaintiff to the insured in March, 2007.

In considering the nature of the relationship, we draw on fundamental principles of agency and fiduciary law. Essential elements of agency are that the principal has the "right to control the agent's actions"; 1 Restatement (Third), supra, § 1.01, comment (f) (1), p. 26; and that "the agent is doing something at the behest and for the benefit of the principal." (Internal quotation marks omitted.) *Beckenstein* v. *Potter & Carrier, Inc.*, 191 Conn. 120, 133, 464 A.2d 6 (1983). "[T]he general fiduciary principle requires that the agent subordinate the agent's interests to those of the principal and place the principal's interests first as to matters connected with the agency relationship." 2 Restatement (Third), supra, § 8.01, comment (b), p. 250. By contrast, the mere fact "that one business person trusts another and relies on [the person] to perform [his obligations] does not rise to the level of a confidential relationship for purposes of establishing a fiduciary duty. . . . [N]ot all business relationships implicate the duty of a fiduciary. . . . [A] mere contractual relationship does not create a fiduciary or confidential relationship."[9] (Citations omitted; internal quotation marks omitted.) *Saint Bernard School of Montville, Inc.* v. *Bank of America*, supra, 312 Conn. 836. "Ostensibly, any time one party hires

another to perform a service on their behalf, 'trust and confidence' [are] placed in the latter party. . . . The unique element that inheres a fiduciary duty to one party is an elevated risk that the other party could be taken advantage of—and usually unilaterally. That is, the imposition of a fiduciary duty counterbalances opportunities for self-dealing that may arise from one party's easy access to, or heightened influence regarding, another party's moneys, property, or other valuable resources." (Emphasis omitted.) *Iacurci* v. *Sax*, 313 Conn. 786, 801–802, 99 A.3d 1145 (2014).

With this background in mind, we turn to the present case. The plaintiff points to the following conduct as proof that the special relationship giving rise to a duty to disclose Intervest's mortgagee interest continued after the plaintiff issued the final claim check in March, 2007: (1) the defendant's August or September, 2007 communication to the plaintiff relaying the inquiry from the other excess insurer as to how the plaintiff had made its payment checks payable; (2) the defendant's actions in response to the 2009 subpoena and 2012 deposition, including billing the plaintiff for Martin's time and using the plaintiff's attorney; and (3) Martin's testimony that the defendant still viewed the plaintiff as a client and the parties as having an ongoing relationship. While we agree that these facts evidence some sort of relationship, we disagree that it was a continuation of the special relationship formed by the agreement to provide full adjustment services.

Prior to March, 2007, while the defendant was providing full adjustment services to the plaintiff, the defendant was under a duty to act for the benefit of the plaintiff. The defendant's dominance or influence, and, hence, its fiduciary duties, arose because it, unlike the plaintiff, was licensed to perform those services in Florida.

None of the defendant's actions after March, 2007, reasonably could be considered further performance of any of the full adjustment services previously delineated and, thus, a further continuation of that fiduciary relationship. The defendant closed its file on the Villas shortly after the plaintiff issued the final claim check, signifying that it had completed its performance of the adjustment services for which it had been hired. See *DeLeo* v. *Nusbaum*, supra, 263 Conn. 597 (formal termination occurs when matter for which defendant was hired comes to conclusion); *Bassett* v. *Mechanics Bank*, 118 Conn. 490, 493, 173 A. 228 (1934) (fiduciary relationship ordinarily "continues until completion of the transaction upon which the agent was employed"); see also 2 Restatement (Third), supra, § 8.01, comment (c), p. 255 ("[a]n agent's fiduciary duty to a principal is generally coterminous with the duration of the agency relationship"). The defendant made no commitment to perform additional adjustment services after the plain-

tiff issued the final claim check. Cf. *Rosenfield* v. *Rogin, Nassau, Caplan, Lassman & Hirtle, LLC*, 69 Conn. App. 151, 161–62, 795 A.2d 572 (2002) (further dealings that were contemplated between parties, evidenced by "promises after the initial wrong or promises to do anything additional in the future," may give rise to continuing fiduciary relationship); *Sanborn* v. *Greenwald*, supra, 39 Conn. App. 297 (noting that no extended relationship existed when attorney made no promise after drafting stipulation that he would perform further services in future). Except for relaying an inquiry from another insurer, there was no communication between the parties for approximately two years after the file was closed. The defendant thereafter initiated communication only because it had received the subpoena, and there was no further communication for three years thereafter, again initiated by the defendant only because it was to be deposed.

In addition to the fact that the defendant's post-2007 actions were not adjustment services, none of those actions bears the hallmarks of agency generally or of a fiduciary specifically. The plaintiff had no right to control the defendant's response to Intervest's discovery requests, directed exclusively to the defendant. See *City Council* v. *Hall*, 180 Conn. 243, 249, 429 A.2d 481 (1980) (it is served party's obligation to comply with lawfully issued subpoena). In fact, there was no evidence that the plaintiff directed the defendant to undertake any action in response to those requests or that it had any expectation that the defendant would do anything other than comply with its legal obligation. The defendant had no obligation, or right, to withhold evidence that could expose the plaintiff to liability, or to assert objections to disclosure on the basis of any right or privilege held by the plaintiff. Instead, the defendant was merely reporting on past events. Cf. *Manzo-Ill* v. *Schoonmaker*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-13-5014084-S (March 7, 2017) (*Povodator, J.*) ("assistance with preparation/presentation of the factual record of prior events, after an otherwise clear cessation of representation, does not constitute continued representation").

Undoubtedly, the defendant's acts in billing Martin's time to the plaintiff and using the plaintiff's attorney reflect some sort of business relationship between the parties. As we previously observed, however, "[n]ot all business relationships implicate the duty of a fiduciary." [10] (Internal quotation marks omitted.) *Saint Bernard School of Montville, Inc.* v. *Bank of America*, supra, 312 Conn. 836. The unique element that gives rise to a fiduciary duty—the risk that the other party could be taken advantage of as a result of one party's access to, or influence regarding, another party's moneys, property, or other valuable resources; *Iacurci* v. *Sax*, supra, 313 Conn. 801–802; was not present during the parties' limited interactions after March, 2007. Thus, irrespec-

tive of whether these facts are sufficient to justify the defendant's belief that the plaintiff continued to be its client, they are plainly insufficient to establish that any fiduciary relationship created by the agreement to perform full adjustment services continued after the plaintiff issued the final check and the defendant closed its file. Cf. *Flannery* v. *Singer Asset Financial Co., LLC*, 312 Conn. 286, 316 n.27, 94 A.3d 553 (2014) (rejecting argument that testimony of managing partner of attorney's law firm, agreeing that attorney's duty to disclose his prior conflict of interest continued indefinitely, was sufficient to establish legal conclusion of fiduciary duty).

Insofar as the plaintiff contends that *Vanliner Ins. Co.* v. *Fay*, 98 Conn. App. 125, 907 A.2d 1220 (2006), supports a contrary conclusion, the relationship in that case is materially distinguishable. In *Vanliner Ins. Co.*, the defendant insurance adjuster breached a continuing duty to the plaintiff insurance company by failing to disclose that the defendant had not timely filed a notice of transfer of a workers' compensation claim to the Second Injury Fund, which exposed the plaintiff to liability. Id., 139–42. *Vanliner Ins. Co.* is distinguishable precisely because the defendant in that case continued to represent the plaintiff in proceedings relating to the claim during the relevant period. Id., 127–28, 131. There was an unchallenged factual finding that the defendant in *Vanliner Ins. Co.* continued to act as the plaintiff's agent. Id., 140–41. The defendant in the present case did not continue to act in any such representative capacity.

We conclude that the evidence did not establish that any existing fiduciary relationship between the parties continued through October, 2010.

B

This conclusion does not, however, end our inquiry. The plaintiff also relies on case law in which our appellate courts have recognized that a duty to warn or correct a mistake may extend after the termination of the special relationship that gave rise to that duty. Our case law has not made it clear whether this basis for tolling falls under the special relationship prong or the later wrongful conduct prong. However, with one limited exception, which we discuss in part II of this opinion, all of the cases involving this basis arise following the termination of a special relationship. Therefore, we analyze this basis under the special relationship prong. We conclude that the limited circumstances under which such a duty would continue were not satisfied in the present case.

As a general matter, "the continuing course of conduct is not the failure of the alleged tortfeasor to notify the plaintiff of his wrongdoing." *Connell* v. *Colwell*, 214 Conn. 242, 255, 571 A.2d 116 (1990); see also *Flannery* v. *Singer Asset Financial Co., LLC*, supra, 312 Conn.

321–22 (argument that former attorney's ongoing failure to confess his earlier tortious act tolled limitation period would make statute of limitations illusory). A duty to warn or take corrective action that could reveal such wrongdoing may continue after a fiduciary or confidential relationship terminates, however, if the defendant has *actual* knowledge of the underlying facts and their significance. See *Martinelli* v. *Fusi*, supra, 290 Conn. 363 ("in all of those cases in which we have imposed a continuing duty on the defendant in the absence of an ongoing physician-patient relationship, the plaintiff had submitted at least some subjective evidence that the defendant was actually aware of the requisite underlying facts" [emphasis omitted]); *Neuhaus* v. *DeCholnoky*, 280 Conn. 190, 203, 905 A.2d 1135 (2006) (" 'a continuing duty must rest on the factual bedrock of actual knowledge' ").[11]

Such a duty will continue only as long as there remains an opportunity to cure, or at least mitigate, the injury from the initial breach that gave rise to the cause of action. See *Targonski* v. *Clebowicz*, 142 Conn. App. 97, 110, 63 A.3d 1001 (2013) ("[E]ven after an attorney's representation of a client ends, he owes a duty to his client, which relates back to his original wrong of rendering negligent services to the client, to correct the results of such prior negligence if he later learns of the negligence at a time when he has the power to remedy the problems arising from it. . . . By force of simple logic, this duty continues until such time as he takes action to cure his prior negligence or the opportunity to cure such prior negligence ceases to exist." [Citation omitted.]); *Sanborn* v. *Greenwald*, supra, 39 Conn. App. 297 ("The defendant . . . had no continuing duty to notify the plaintiff of the alleged mistake in the stipulation in the absence of proof that he subsequently learned that his drafting was negligent. . . . The defendant's professional representation had ended . . . . Further, the defendant was not capable of remedying any problems with the stipulation once it had been approved by the trial court . . . ." [Citations omitted.]).[12] This limitation is compelled by the policy underlying this tolling doctrine, namely, that "specific tortious acts or omissions may be difficult to identify *and may yet be remedied*." (Emphasis added; internal quotation marks omitted.) *Watts* v. *Chittenden*, 301 Conn. 575, 583–84, 22 A.3d 1214 (2011).

The plaintiff's argument founders on the actual knowledge requirement. Although it asserts in its brief to this court that the defendant had actual knowledge of Intervest's mortgagee interest before the plaintiff issued the final Villas check, it took a markedly different tack at trial. The plaintiff did not assert any claims of intentional misconduct. At trial, the plaintiff effectively conceded to the court, in a pretrial proceeding, and to the jury, both in its counsel's cross-examination of Oberpriller and Martin, and in counsel's closing argu-

ment, that the defendant did not have actual knowledge of the mortgage schedule. In those statements, the plaintiff's counsel plainly acknowledged that the plaintiff was not claiming that the defendant's failure to disclose the mortgage information in the Aspen file was intentional.[13] Instead, the plaintiff's counsel emphasized that the plaintiff's claim was that the defendant had been negligent because the information was in its file, and, because if Oberpriller had looked in that file, he *could have* discovered that information and in turn disclosed it. See footnote 13 of this opinion. In other words, the plaintiff's theory of the case was premised on the defendant's constructive knowledge based on its possession of the information, not its subjective, actual knowledge.

Even if we could overlook the statements by the plaintiff's counsel and examine the entirety of the evidence, as the plaintiff suggests we should do, we would not be persuaded that there is a basis on which the jury reasonably could have concluded that the defendant had actual knowledge of Intervest's mortgage interest prior to the 2012 deposition proceedings.[14] Both Martin and Oberpriller testified that they had no recollection of ever seeing the schedule of mortgagees during the relevant time frame. The evidence regarding the respective roles of Martin and Oberpriller in the adjustment process, and the management of paperwork received, was consistent with this testimony. Although Oberpriller took action in response to the letter that was accompanied by the schedule, that letter did not refer to the Villas or Intervest; nor did it make clear that the enclosed document provided mortgagee information for any property other than Park Apartments. In sum, the evidence established that a secretary filed the schedule, unseen by any person who might have recognized its significance, in a thin file that was never incorporated into Oberpriller's working file.

We recognize that the sufficiency of evidence is viewed in the light most favorable to sustaining the jury's verdict. See *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 370–71, 119 A.3d 462 (2015); see also *Gronowski* v. *Spencer*, 424 F.3d 285, 291 (2d Cir. 2005) (applying similar standard under federal law). In that vein, we are mindful that the jury was free to discredit testimony from Martin and Oberpriller as to their lack of knowledge. Nonetheless, the jury was not free to conclude from that rejection that the opposite of the testimony is true. See *Burns* v. *Adler*, 325 Conn. 14, 40 n.17, 155 A.3d 1223 (2017); *State* v. *Alfonso*, 195 Conn. 624, 634, 490 A.2d 75 (1985). There was no evidentiary basis to conclude that the defendant had actual knowledge of Intervest's mortgage interest. Cf. *Bednarz* v. *Eye Physicians of Central Connecticut, P.C.*, 287 Conn. 158, 167, 947 A.2d 291 (2008) (there was genuine issue of material fact as to whether defendant had actual knowledge of test result in plaintiff's medical records when defendant denied knowledge and

plaintiff presented expert testimony that defendant would have known about such information).

This conclusion is in accord with the District Court's view of the record. That court's decision is replete with express or implicit conclusions that the evidence demonstrates that the defendant had only constructive knowledge.[15] Nowhere is this evidenced more plainly than the court's statement that the defendant "did not actually know of its omission until Martin discovered the Aspen file in 2012." Consistent with that view of the evidence, the Second Circuit posited that the plaintiff might be able to prevail under the later wrongful conduct prong of the tolling doctrine because certain post-2007 events "*could have* put the [defendant] on notice that *something was amiss* with its loss adjustment work. Yet, throughout, [the defendant] failed to inform the plaintiff about Intervest's interest as a mortgagee." (Emphasis added.) *Evanston Ins. Co.* v. *William Kramer & Associates, LLC*, supra, 890 F.3d 51.

Therefore, on the basis of the record before us, we conclude that the evidence is not legally sufficient to establish a continuing duty on the basis of a special relationship.

## II

The question that remains is whether the plaintiff presented legally sufficient evidence to establish a breach of a duty that continued after the final check was issued through later wrongful conduct by the defendant related to its prior omission. See *Saint Bernard School of Montville, Inc.* v. *Bank of America*, supra, 312 Conn. 837. Such later wrongful conduct also may include acts of omission. See, e.g., *Flannery* v. *Singer Asset Financial Co., LLC*, supra, 312 Conn. 312–13; *Rosenfield* v. *Rogin, Nassau, Caplan, Lassman & Hirtle, LLC*, supra, 69 Conn. App. 161. Again, to prevail under this theory in the present case, the plaintiff had to prove that such wrongful conduct continued until at least October, 2010.

The federal courts focused on the events occurring during the course of the Intervest action. The District Court concluded that the only post-2007 conduct by the defendant that could possibly be considered wrongful was its incomplete response to the 2009 subpoena. Because that omission occurred more than three years before commencement of the action, the District Court concluded that the plaintiff could not prevail on that basis. The Second Circuit suggested that the pretrial proceedings in the Intervest action between 2009 and 2012 "could have put the defendant on notice that something was amiss in its loss adjustment work." *Evanston Ins. Co.* v. *William Kramer & Associates, LLC*, supra, 890 F.3d 51.

In its brief to this court, the plaintiff does not identify any particular action by the defendant that constituted later wrongful conduct. Rather, its argument is that the

defendant's ongoing failure to disclose the existence of Intervest's mortgagee interest was later wrongful conduct that continued until the defendant's 2012 disclosure of the mortgagee schedule. For the reasons previously set forth in part I B of this opinion, the plaintiff cannot prevail on this basis.

We observe that, in the context of product liability type cases of older vintage, this court recognized a continuing duty to warn without requiring the defendant's actual knowledge of the condition.[16] See *Giglio* v. *Connecticut Light & Power Co.*, 180 Conn. 230, 242, 429 A.2d 486 (1980) (there was later wrongful conduct to support continuing course of conduct when defendant installed defective safety switch on furnace and, thereafter, in response to repeated complaints, gave negligent instructions to plaintiff on how to respond); *Handler* v. *Remington Arms Co.*, 144 Conn. 316, 321, 130 A.2d 793 (1957) (applying continuing course of conduct doctrine to toll statute of limitations on basis of continuing duty to warn of defective cartridge by manufacturer). Such cases are now governed by a different statute of limitations; see General Statutes § 52-577a; and we since have recognized that they implicate different policy concerns. See *Neuhaus* v. *DeCholnoky*, supra, 280 Conn. 203–204 ("While there may be instances in product liability situations where a continuing duty to warn may emanate from a defect, without proof that the manufacturer actually knew of the defect . . . the same principle does not apply to a physician's misdiagnosis. To apply such a doctrine to a medical misdiagnosis would, in effect, render the repose part of the statute of limitations a nullity in any case of misdiagnosis. We do not think that the language or policy of the statute permits such a reading." [Internal quotation marks omitted.]); *Nardi* v. *AA Electronic Security Engineering, Inc.*, 32 Conn. App. 205, 213–14, 628 A.2d 991 (1993) (rejecting plaintiff's reliance on cases holding that continuing duty to warn arises from inherently dangerous situation or defective product because complaint did not allege inherently dangerous situation or defective product, and telephone jack in that case, even if negligently installed, did not pose unreasonable risk of personal injury sufficient to give rise to continuing duty to warn); see also General Statutes § 52-572q (prescribing conditions for product liability due to failure to provide adequate warnings or instructions). As such, this line of cases is inapplicable to the present case. Indeed, the plaintiff does not contend before this court that something short of actual knowledge would suffice.

Finally, insofar as the Second Circuit suggested the possibility that the discovery efforts in the Intervest action should have put the defendant on notice that "something was amiss" in its loss adjustment work, the relevance of such a possibility to our continuing course of conduct tolling doctrine is unclear. The Second Circuit may have had in mind the "storm warnings" doc-

trine it has adopted in the context of certain federal actions that accrue upon discovery of the injury; see, e.g., *Staehr* v. *Hartford Financial Services Group, Inc.*, 547 F.3d 406, 411 (2d Cir. 2008);[17] but no such discovery rule is applicable to § 52-577. To the extent that the court may have been questioning whether we would recognize a continuing duty to investigate as long as any business relationship existed between the parties, we would not. Generally, an agent's duty to use reasonable efforts to give his principal information that is relevant to the affairs entrusted to him ends with the termination of the agency. See 2 Restatement (Third), supra, § 8.11, comment (c), p. 376.

In sum, the trial evidence is not legally sufficient to support the jury's finding that the statute of limitations was tolled at least through October 21, 2010, thus rendering the plaintiff's action timely under the continuing course of conduct doctrine, on the basis of either a special relationship or later wrongful conduct.

We answer the certified question "no."

No costs shall be taxed in this court to either party.

In this opinion the other justices concurred.

[1] The case as captioned in the Second Circuit reflects that Evanston Insurance Company is the successor company to the plaintiff; as the Second Circuit noted, "there is no meaningful difference for purposes of this appeal . . . ." *Evanston Ins. Co.* v. *William Kramer & Associates, LLC*, supra, 890 F.3d 42 n.2.

[2] Another insurance company shared equally with the plaintiff the second layer of coverage of $10 million. We omit any discussion of that insurer as their liability is not relevant to this case.

[3] Although the attorneys in this case have referred to this file as the "Aspen file," Martin testified that the defendant's employees never referred to it as such. Nonetheless, it appears uncontested that this file contained information relating to claims for which Aspen provided coverage.

[4] These misstatements appear to stem from several sources. IDM's Aspen policy listed mortgagee endorsements for the three other IDM properties but not for the Villas. According to Oberpriller's testimony, two principals of IDM also repeatedly and emphatically represented to the defendant that there was no mortgage on the Villas. The plaintiff's executive claims examiner testified that the plaintiff did not expect the defendant to conduct a title search on the property as part of the loss adjustment process.

[5] IDM negotiated the policy checks without paying off the mortgage. Thereafter, it failed to repair the property, to pay property tax, and to continue making mortgage payments. The property was foreclosed.

[6] In response to a question asking what Martin had done when he received the notice of deposition, which appears to have been accompanied by a subpoena duces tecum, he testified: "I had a new secretary then, Brenda. She went back through my file, an off-site storage, she found this file, this first file, C7-289, which is our office file, separate from those two boxes we had supplied earlier. This is just a file that she would keep in Tampa. When she got paperwork on the file, she would put it in that file. You got to remember, we had seven hundred files like this at one time." Martin described the file as thin.

[7] Although the defendant asserted a special defense that the action was time barred, it did not move for summary judgment on that ground, instead advancing that issue in its proposed jury instructions.

[8] Although we have stated that "some actors are per se fiduciaries by nature of the functions they perform . . . includ[ing] agents"; *Iacurci* v. *Sax*, 313 Conn. 786, 800, 99 A.3d 1145 (2014); it is an open question as to whether every act undertaken by one's agent implicates fiduciary duties. Compare *Konover Development Corp.* v. *Zeller*, 228 Conn. 206, 223, 635 A.2d 798 (1994) (noting that, because relative sophistication of parties may impact fiduciary obligations, "[s]imply classifying a party as a fiduciary inadequately

characterizes the nature of the relationship"), and 1 Restatement (Third), Agency § 1.01, comment (e), p. 23 (2006) ("[f]iduciary duty does not necessarily extend to all elements of an agency relationship"), with *Taylor* v. *Hamden Hall School, Inc.*, 149 Conn. 545, 552, 182 A.2d 615 (1962) ("[a]n agent is a fiduciary with respect to matters within the scope of his agency").

[9] See, e.g., *Fichera* v. *Mine Hill Corp.*, 207 Conn. 204, 210, 541 A.2d 472 (1988) (contractual relationship of vendor-vendee in sale of land did not give rise to obligations equivalent to those of fiduciary, and, thus, no continuing duty was imposed on defendants as perpetrators of fraud to disclose prior lack of candor to plaintiffs); *Iacurci* v. *Sax*, supra, 313 Conn. 801–802 (relationship between tax return preparer, including accountant, and its client generally is not fiduciary in nature); *Saint Bernard School of Montville, Inc.* v. *Bank of America*, supra, 312 Conn. 836–37 (relationship between depositor and bank is not fiduciary or confidential relationship).

[10] The District Court noted the plaintiff's payment of the defendant's litigation expenses in connection with the Intervest discovery and concluded that the jury reasonably could have inferred that the defendant acted "in some form as [the plaintiff's] 'agent,'" and, thus, owed the plaintiff a duty of care in responding to the subpoena. The court further concluded that this duty was not a continuation of the original duty of care of adjusting the Villas claim, but a different duty. We view the facts through a different lens. We need not determine whether the defendant's acceptance of payment to cover legal expenses gave rise to a duty of care owed to the plaintiff because, in any event, no agency relationship was continued, renewed or created by the payment of such expenses. We need not answer the question raised by the Second Circuit as to whether the continuing duty must be the identical duty giving rise to the original breach or merely a related duty, because no agency relationship between the parties existed in connection with the subpoena compliance.

[11] See, e.g., *Martinelli* v. *Fusi*, supra, 290 Conn. 364–65 (recognizing continuing duty could arise based on actual knowledge of condition requiring treatment but concluding that evidence did not support such knowledge); *Bednarz* v. *Eye Physicians of Central Connecticut, P.C.*, 287 Conn. 158, 167–68, 947 A.2d 291 (2008) (there existed genuine issue of material fact with respect to whether statute of limitations had been tolled by later wrongful conduct to support continuing course of conduct when plaintiff presented evidence from which jury reasonably could infer that defendant ophthalmologist had actual knowledge of plaintiff's CAT scan in medical records showing brain tumor and defendant's ongoing failure to warn plaintiff after his retirement from medical practice); *Neuhaus* v. *DeCholnoky*, supra, 280 Conn. 196, 205 (no continuing duty in absence of evidence that hospital neonatologist "actually had an initial concern about [baby's] prognosis, or that he subsequently became aware that his original assessment of [baby's] prognosis may have been incorrect"); *Witt* v. *St. Vincent's Medical Center*, 252 Conn. 363, 372, 746 A.2d 753 (2000) (later wrongful conduct to support continuing course of conduct could be established by defendant pathologist's knowledge of facts that caused concern for possibility of cancer at time of initial tests, which gave rise to continuing duty to warn); *Sherwood* v. *Danbury Hospital*, 252 Conn. 193, 211 n.15, 746 A.2d 730 (2000) (noting that prior case law establishes that "a physician may have a duty to correct a previous misdiagnosis when that physician gains knowledge of his or her mistake, without regard to whether the patient continues to maintain a relationship with the physician").

Some of these cases suggest that such a duty may continue even if the facts become known to the defendant after the relationship terminates. See, e.g., *Neuhaus* v. *DeCholnoky*, supra, 280 Conn. 205; *Sherwood* v. *Danbury Hospital*, supra, 252 Conn. 211 n.15. Although we have not had a case in which the continuous course of conduct doctrine was satisfied under such facts, we observe that, in any event, the defendant would necessarily have to gain such knowledge before the limitation period expired.

[12] Compare *Robbins* v. *McGuinness*, 178 Conn. 258, 261–62, 423 A.2d 897 (1979) (no continuing duty to warn former client about results of title search performed in connection with completed land transaction), and *Lee* v. *Brenner, Saltzman & Wallman, LLP*, 128 Conn. App. 250, 251, 258–59, 15 A.3d 1215 (no continuing duty to warn plaintiff of alleged breach of fiduciary duty in connection with concluded representation, which involved drafting of corporation's employment and stockholder agreements), cert. denied, 301 Conn. 926, 22 A.3d 1277 (2011), with *Haas* v. *Haas*, 137 Conn. App. 424, 428, 430–31, 48 A.3d 713 (2012) (defendant breached continuing duty after he failed to file plaintiff's tax returns for several years, placed his

own name on plaintiff's brokerage accounts, causing plaintiff to accumulate liabilities, subsequently withheld documents in his possession that potentially could have reduced or eliminated plaintiff's tax liabilities, and impeded discovery in action to identify assets that remained under defendant's control), and *Vanliner Ins. Co.* v. *Fay*, supra, 98 Conn. App. 125 (insurance adjuster breached continuing duty when, after having failed to file timely notice of transfer of workers' compensation claim to Second Injury Fund, adjuster's failure to inform insurer of timeliness problem prevented insurer from taking steps "to rectify [the adjuster's] initial breach"); see also *Flannery* v. *Singer Asset Financial Co., LLC*, supra, 312 Conn. 319 ("[Our appellate cases addressing the continuous course of conduct doctrine in the attorney-client context] generally reject the notion that the attorney has a continuing duty to the client to correct or report an earlier wrong that, if left unsatisfied, would toll the statute of limitations. They recognize that imposing a continuing duty in such circumstances is futile because, once representation ceases, the initial wrong typically is complete, and in the usual situation, it no longer can be undone by the attorney." [Footnote omitted.]).

[13] In its response to the trial court's order to show cause why the complaint was not barred by the statute of limitations, the plaintiff argued: "[The defendant's] subsequent wrongs are related to its prior wrongful act, by way of example failing to look in, discover and/or have knowledge of its own files." In a subsequent pretrial conference addressing whether the plaintiff could establish tolling under the continuing course of conduct doctrine, the plaintiff's counsel asserted that the 2009 subpoena provided "an opportunity at that point . . . for [the defendant] to discover that [mortgagee schedule] . . . . So it's certainly not an intentional allegation, but we think it rises to the level of negligence."

At trial, in response to Martin's testimony that he had "never seen" the Aspen file, the plaintiff's counsel stated: "I know. And I'm not saying that you're—at the time that you had seen it. There is no intentional claim against [the defendant] in this case, sir. It's a negligence case. You understand that, right? . . . It's what you knew or should have known, right? . . . And you should have known what was in your own files, right?"

In its memorandum in opposition to the defendant's motion for judgment as a matter of law, the plaintiff pointed to Oberpriller's testimony in which he answered affirmatively to the following question: "Would you agree with me, sir, that had you looked in [the defendant's file], or had you looked at this particular letter that was addressed to you . . . that you *could have seen* on the schedule of mortgages that were included with it that the Villas did have a mortgagee?" (Emphasis added.)

This testimony was emphasized by the plaintiff's counsel in closing argument. At the initial closing argument, the plaintiff's counsel stated: "And what did [Oberpriller] say? He said, if I had looked in my own file, I would have known the information. And he said if I had that information, I would have changed my reports. It's negligence. Not intentional. We're not saying they did this and don't tell anyone. The subpoena's here, we're going to hide this in our office. But it rises to negligence. They had the duty by law." In rebuttal closing argument, the plaintiff's counsel reiterated: "I asked . . . Oberpriller in his deposition, if he had known about [the Intervest mortgage] you would have changed your reports? Yes. But he didn't change them. And that's the negligence."

[14] In its reply brief, the plaintiff points to a check from Aspen naming Intervest as a payee, as evidence of the defendant's actual knowledge, accompanied by a letter sent under Oberpriller's name via his secretary. We note that the record certified to this court does not reflect that this check was admitted at trial as a full exhibit; it only reflects that this exhibit was appended to the plaintiff's complaint. None of the trial testimony provided to this court refers to it, and there is no mention of it in either the District Court's decision or the Second Circuit's order. Therefore, we express no opinion as to whether the jury could have found actual knowledge on the basis of this check, despite the plaintiff's statements implicitly acknowledging the defendant's lack of actual knowledge of Intervest's mortgagee interest.

[15] The court's decision states: "[The plaintiff] feared that [the defendant's] constructive knowledge that Intervest was a mortgagee on the Villas would be imputed to [the plaintiff] . . . ." The court rejected the proposition that the defendant "was indefinitely bound to recheck its files to ensure that its earlier statement that there was no mortgagee interest on the Villas was indeed correct." The court further stated that "[t]he fact that [the defendant] had a limited ongoing duty to advise [the plaintiff] if, in the future, it learned

something new about the Villas is not the same as an ongoing duty to correct prior wrongful conduct of which it was not aware." The court questioned imposing a continuing duty on the defendant to "correct its inadvertent omission," discussed the defendant's duty "[i]f . . . there had been evidence showing that . . . [the defendant] had, after 2007, come across a reason to become concerned that it was wrong about there being no mortgagee," and stated that, "[a]rguably, [the defendant] also had a duty that continued throughout the pendency of the Intervest action to supplement its subpoena response in the event it became aware of other documents in its possession."

[16] In *Sherwood* v. *Danbury Hospital*, 252 Conn. 193, 208–209, 746 A.2d 730 (2000), we recognized a continuing duty to warn under the later wrongful conduct prong without determining whether a special relationship existed between the plaintiff patient and the defendant hospital performing the blood transfusion that gave rise to the injury. However, in the second appeal in that case following our remand, this court underscored that the continuing duty recognized in the first appeal rested on an allegation that the defendant had administered the blood transfusion *knowing* that the blood had not been tested for HIV but failed to advise the plaintiff of that fact. See *Sherwood* v. *Danbury Hospital*, 278 Conn. 163, 189–90, 896 A.2d 777 (2006).

[17] In *Staehr*, for example, the court explained: "The [two year] statute of limitations for securities fraud claims under the [Securities] Exchange Act [of 1934] begins to run only after the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge. . . . When there is no actual knowledge, but the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry. *Dodds* v. *Cigna* [*Securities, Inc.*], 12 F.3d 346, 350 (2d Cir. 1993). Such circumstances are often analogized to storm warnings. Id." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Staehr* v. *Hartford Financial Services Group, Inc.*, supra, 547 F.3d 411; accord *Rosenshein* v. *Meshel*, 688 Fed. Appx. 60, 63 (2d Cir. 2017) (applying doctrine to Racketeer Influenced and Corrupt Organizations Act [RICO] action); see also *In re Trilegiant Corp.*, 11 F. Supp. 3d 82, 106 (D. Conn. 2014) (referring to doctrine as " 'storm clouds' "), aff'd sub nom. *Williams* v. *Affinion Group, LLC*, 889 F.3d 116 (2d Cir. 2018).